657 So.2d 906 (1995)
Phillip CASSAMASSIMA, Appellant,
v.
STATE of Florida, Appellee.
No. 93-2522.
District Court of Appeal of Florida, Fifth District.
June 2, 1995.
Certification Denied July 11, 1995.
*907 James B. Gibson, Public Defender, and M.A. Lucas, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Carmen F. Corrente, Asst. Atty. Gen., Daytona Beach, for appellee.
EN BANC
GRIFFIN, Judge.
We have voted to hear this case en banc to reconsider the panel decision in Hart v. State, 633 So.2d 1189 (Fla. 5th DCA 1994), involving the same issue as the present case. The question presented is whether a person convicted of lewd assault on a child can be required to submit to a polygraph at regular intervals (in this case, twice a year) as a condition of probation or community control. We answer the question in the affirmative.[1]
Since 1952, polygraph results have been held inadmissible in Florida to prove guilt,[2] *908 based on what was then a uniform body of law from other jurisdictions finding a lack of general acceptance of their accuracy by the scientific community.[3] The Supreme Court of Florida also has previously expressed hostility to the use of polygraphs for investigative purposes.[4] Many jurisdictions, however, including Florida, do allow evidence of a polygraph by agreement of the parties. Davis v. State, 520 So.2d 572, 574 (Fla. 1988); Jones v. State, 453 So.2d 226 (Fla. 5th DCA 1984).
To this day, absent a stipulation, very few courts will allow evidence of polygraph results to be admitted for any purpose. The most notable exception is United States v. Piccinonna, 885 F.2d 1529, 1532 (11th Cir.1989). In 1989, the Eleventh Circuit sitting en banc surveyed the developing scientific literature and concluded that it was "no longer accurate to state categorically that polygraph testing lacks general acceptance for use in all circumstances."[5] 885 F.2d at 1532. The Piccinonna court made mention of the fact that polygraph tests are in wide use for non-evidentiary purposes and that better equipment and better trained examiners have greatly improved accuracy. Thus, in the Eleventh Circuit, polygraph evidence is now admissible to impeach or corroborate the testimony of a witness. The only state court that permits similarly broad admissibility is New Mexico. Giannelli, 30 Crim. L.Bull. at 373.
It appears that factors other than reliability have influenced courts against the evidentiary use of lie detector test results, including the risk that the issue of the polygraph and its accuracy will generate disproportionate expense on both sides of a criminal trial and degenerate into a battle of experts that will unduly bog down the trial or become the focus of the case. Also, there is the danger that the jury may give disproportionate weight to this scientific means of assessing credibility. Id. at 369. It is therefore not surprising that in non-trial contexts such as suppression hearings, prison disciplinary hearings, or motions for new trial, polygraph *909 results are much more likely to be admitted. Id. at 377.
At least two other Florida courts have assumed the validity of a polygraph examination as a condition of probation. Nichols v. State, 528 So.2d 1282, 1284 (Fla. 1st DCA 1988); Hockman v. State, 465 So.2d 619, 620 (Fla. 2d DCA 1985). Nevertheless, the majority in Hart held that such a condition is invalid because to rely on the results of a polygraph examination is an improper delegation of a trial court's fact finding authority and because the polygraph is unreliable for forensic use. While the dissent agreed that the results of the polygraph were inadmissible to prove a probation violation, it found the condition valid for purposes of deterrence and supervision of the probationer. We approve the latter approach.
The trial judge in this case, who is the same as in Hart, again expressed her reason for imposing the polygraph examination condition:
THE COURT: As a special condition of your Community Control and probation, I am going to require that within the first ninety days that you are on this sentence that you obtain an evaluation by an evaluator who is experienced in dealing with sex offenders, that you attend and successfully complete any counselling required as a result of that evaluation.
You may choose the evaluator and you may choose the counselling facility or counselor, but they must be ones that are acceptable to your Community Control or probation officer.
I am going to agree to waive the costs of your supervision of Community Control or probation while you are engaged in counselling of any type, either sex counselling or drug offender counselling, in order to assist you with paying these costs, but you will be required to make these restitution payments until the restitution is paid in full.
* * * * * *
THE COURT: As a part of the counselling which, if counselling is indicated, then as a part of the counselling, if there is no sex offender counselling indicated, then independently at least once every six months for the first two years and then once every year thereafter, I am going to require that you obtain a monitoring examination, a polygraph examination by an experienced polygraph examiner and that at that time following that you answer the following questions in the polygraph, the first is since your last polygraph test or since sentencing in the case which would be the question at the very, very, first, have you been alone with a child and since your last polygraph test or since sentencing have you had any manner of sexual contact with a child.
The polygraph will be administered by a polygraph examiner who is experienced in administering polygraphs to sex offenders.
There are several in our area.
You may choose one as long as that one is acceptable to your Community Control or probation officer.
The Court imposes the special condition based on research which shows that this is a valid and effective deterrent to reoffend and is both valid and effective in dealing with denial that are critical in dealing with evaluation of rehabilitation of sex offenders and in large part because sex crimes, particularly with children, are secret crimes as to which it is very difficult to make an effective either detection or an effective way to monitor whether we are having a violation of either the Community Control or the probation.
A yes answer to either of those questions or a no answer which indicates deception would form the basis for a violation of community control or probation in this case.
Section 948.03, Florida Statutes (1993) establishes that probationers may be subject to a variety of requirements, such as mandatory drug or alcohol testing, that would significantly interfere with their rights or liberties in other contexts. So long as the condition is reasonably related to the offense, to the rehabilitation of the defendant or to the protection of the public, it is a valid condition of probation or community control. Grubbs v. State, 373 So.2d 905, 909 (Fla. 1979); Nichols, 528 So.2d at 1284. In Larson *910 v. State, 572 So.2d 1368 (Fla. 1991), in considering a condition of probation that forbade the defendant from entering Tallahassee, the high court said that:
As a general rule, a condition of probation that burdens the exercise of a legal or constitutional right should be given special scrutiny. However, a defendant cannot successfully challenge every aspect of a prior order of probation simply because it infringes on some such rights. Most sentences and orders of probation have that effect, if only because they restrict liberty to some extent.
Larson, 572 So.2d at 1371.
The courts of other jurisdictions are virtually unanimous in approving the requirement of a polygraph as a condition of probation.[6]See generally Anne M. Payne, Annotation, Propriety of Conditioning Probation on Defendant's Submission to Polygraph or other Lie Detector Testing, 86 A.L.R.4th 703 (1991). This is so, even though in those jurisdictions, as in Florida, polygraph results are not admissible evidence in a criminal trial. These courts seem to recognize that such a condition of probation is valid because it provides a psychological deterrent, Mann v. State, 154 Ga. App. 677, 269 S.E.2d 863, 866 (1980), and will assist the work of the probation officer in assuring the probationer does not re-offend. People v. Miller, 208 Cal. App.3d 1311, 256 Cal. Rptr. 587 (1989). Many of the decided cases involve sex offenders. See, e.g., State v. Sejnoha, 512 N.W.2d 597 (Minn. Ct. App. 1994); Miller, supra. At least one court, however, has reached a result virtually identical to the one we reach in the context of a burglary case. Patton v. State, 580 N.E.2d 693 (Ind. Ct. App. 1991). In State v. Flores-Moreno, 72 Wash. App. 733, 866 P.2d 648, 655, review denied, 124 Wash.2d 1009, 879 P.2d 292 (1994), the court found that a condition requiring a drug offender to submit to a polygraph examination was proper so long as the polygraph examinations related to drugs and did not stray into subjects not directly related to his offense. In Oregon, by statute, polygraph examinations are a valid condition of probation. Patton, 580 N.E.2d 693. Or. Rev. Stat. § 137.540(2)(b); State v. Victoroff, 96 Or. App. 176, 770 P.2d 922 (1989).
Some jurisdictions have gone even farther in using polygraph test results in probation proceedings. Recently, in State v. Travis, 125 Idaho 1, 867 P.2d 234 (1994), the high court of Idaho held that evidence of the results of a polygraph examination was admissible in a probation revocation hearing as a factor that the court could consider in concluding it was appropriate to revoke the probation of a probationer who had been convicted of lewd conduct with an eight-year old. The polygraph test results indicated he had been deceptive in answering questions concerning whether he had been involved in sexual activity with minors. Accord State v. Fogarty, 187 Mont. 393, 610 P.2d 140 (1980), overruled by State v. Burke, 235 Mont. 165, 766 P.2d 254 (1988).
Several courts have considered Fifth Amendment objections to such a condition of probation, but these objections usually have been rejected on the ground that the intrusion into the area of self-incrimination when someone is required to answer truthfully during a lie detector examination is no greater than the requirement that a probationer answer truthfully all reasonable inquiries of his probation officer. Owens v. Kelley, 681 F.2d 1362, 1370 (11th Cir.1982); see also Fogarty, 610 P.2d at 149; Mann, 269 S.E.2d 863; State v. Age, 38 Or. App. 501, 590 P.2d 759 (1979).[7] Such a condition "clearly is reasonably related to [the offender's] probation in that it deters him from violating the terms of his probation by instilling in him a fear of detection." Owens, 681 F.2d at 1370. The court may require certain questions be asked of the probationer and when the question is asked, the probationer is free to assert a Fifth Amendment privilege, if appropriate. Id. at 1369.
*911 The United States Supreme Court in Minnesota v. Murphy, 465 U.S. 420, 436-39 n. 7, 104 S.Ct. 1136, 1147 n. 7, 79 L.Ed.2d 409 (1984) has explained that a probationer may not refuse to answer a question just because his answer would disclose a probation violation; he may only refuse to answer if a truthful answer would expose him to prosecution for a crime different from the one of which he was already convicted. Murphy, 465 U.S. at 442-43, 104 S.Ct. at 1150 (Marshall, J. dissenting.) It is permissible to order no contact with children as a condition of probation and to require the defendant to answer whether he had such contact.[8] As Judge Harris points out in his concurring opinion, this appears to be what the Florida Supreme Court was alluding to in State v. Heath, 343 So.2d 13, 16 (Fla. 1977), cert. denied, 434 U.S. 893, 98 S.Ct. 269, 54 L.Ed.2d 179 (Fla. 1977). As the Heath court said, a probationer may be required to provide all necessary information for his supervision. He may be required to confirm or deny his location at a particular place at a particular time, explain his non-criminal conduct and submit to a search of his quarters and of his person; his Fifth Amendment rights relate only to a separate criminal offense. Id. If a probationer chooses not to answer questions about non-criminal conduct or to submit to such searches, his probation can be revoked.
The United States Supreme Court in Murphy also recognized the right of the state to require a probationer to answer even incriminating questions so long as the answers are not used against him in a prosecution for the criminal conduct:
Our cases indicate, moreover, that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination. Under such circumstances, a probationer's "right to immunity as a result of his compelled testimony would not be at stake," [citations omitted] and nothing in the Federal Constitution would prevent a State from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as "one of a number of factors to be considered by the finder of fact" in deciding whether other conditions of probation have been violated. [Citations omitted].
Id. at 435, 104 S.Ct. at 1146.
In the present case, the lower court expressed the view that the polygraph condition was justified by the circumstances of the particular offense and the information available to the court suggesting that polygraphs offered a deterrent to re-offense. We hold that the lower court may require this defendant to take a polygraph at reasonable intervals and to respond to questions that concern non-criminal conduct so long as the results of the polygraph are not offered in evidence.[9] Consistent with Murphy, the probationer may only refuse to answer if it is within his Fifth Amendment right to do so. The state then may elect whether to require the answer by eliminating the threat of prosecution for the crime.
AFFIRMED in part; REVERSED in part.
*912 COBB, GOSHORN and PETERSON, JJ., concur.
HARRIS, C.J., concurs and concurs specially, with opinion, in which COBB, J., concurs.
DAUKSCH, J., dissents, with opinion, in which W. SHARP, and THOMPSON, JJ., concur.
W. SHARP, J., dissents, with opinion.
THOMPSON, J., dissents, with opinion, in which W. SHARP, J., concurs.
HARRIS, Chief Judge, concurring specially:
I concur with Judge Griffin's well-reasoned analysis that the polygraph is an appropriate tool in supervising probation or community control. But that is merely the threshold to the more intriguing issue: what questions may be asked and what will be the effect of a refusal to answer?
In State v. Heath, 343 So.2d 13 (Fla. 1977), the supreme court held that the agreement by the probationer to accept probation effectively waives his Fifth Amendment privilege with regard to his noncriminal conduct even without an express agreement with the court to do so. This would include, for example, having to divulge his name, place of residence, employment, and his location at a particular place at a particular time. This implied waiver is based on the fact that probation itself would be impractical if the probationer was not required to respond to such questions from his probation supervisor. But the court held that this implied waiver based on the acceptance of probation would not waive the probationer's Fifth Amendment rights relating to "specific conduct and circumstances concerning a separate criminal offense."
But Heath did not address the possibility of an express waiver. In Heath, the defendant was compelled to answer questions relating to a subsequent criminal offense in order to establish the basis for violating a previous probation. But his previous probation was not conditional on a specific requirement that he testify concerning subsequent violations. The court ordered Heath to testify merely because he was on probation. Clearly Heath was right in holding that merely being placed on probation, without more, does not constitute a waiver of the Fifth Amendment rights concerning other crimes.
But suppose, in order to induce the court to grant probation, the defendant agrees specifically to waive his Fifth Amendment rights in the future as to all conduct relative to the crime for which he is on probation (or community control). "Judge, if you put me on probation for sexually abusing this child, I promise never to abuse a child again and, in order to prove my good intentions, you may ask me under oath, at any time, whether I have abused any other child during the time I'm serving probation." If the defendant has the right to waive his Fifth Amendment right against self-incrimination, does he not have the further right to agree to waive it in order to get probation? Is it somehow unseemly, unfair, even unconstitutional, for a judge who has the power (and responsibility) to determine if the defendant should be granted the "grace" of probation to require such waiver in order to be considered for probation?
In Bentley v. State, 411 So.2d 1361, 1364 (Fla. 5th DCA), rev. denied, 419 So.2d 1195 (Fla. 1982), we held in a unanimous, per curiam opinion:
When, at sentencing, the trial court proposes the conditions under which it will offer probation, the defendant should at the time seriously consider the matter and if he feels the conditions lade him with burdens too grievous to be borne, the defendant should forthrightly object to them at that time and place. It is true that an accused does not have bargaining power with the judge, but that is not the point. The defendant's legal right is to not receive a sentence of confinement in excess of the statutory maximum. If he feels the proffered probation with conditions is more onerous than the maximum confinement permitted by law, he should reject the tendered offer of probation. This is not unfair because the predicament leading to his dilemma is a matter of his own making and the trial judge is acting for organized society. It is the duty of the trial court, on *913 behalf of the public and the defendant, to fashion such conditions of probation as, in the trial court's judgment, will serve to rehabilitate the defendant and protect and serve the public. If the trial court is adamant that the conditions are necessary, the defendant should either refuse probation or accept it as offered.
While it is true that Cassamassima did object to the polygraph examination, he clearly did not intend to reject probation if the court insisted on such condition.[1] Further, he made no objection to the specific questions proposed to be answered.
In my view, Cassamassima's proforma objection does not override his acceptance of a specific condition of probation that he answer certain questions while attached to a polygraph. If he now wishes to reject community control if those conditions are attached and be incarcerated instead, the trial court should consider his request.
COBB, J., concurs.
DAUKSCH, Judge, dissenting.
I respectfully dissent.
For the same reasons expressed in Hart v. State, 633 So.2d 1189 (Fla. 5th DCA 1994), I dissent. After many years of law practice and observation of the use of lie detectors I remain convinced they have no place in courts of law. While I know some retailers use them to test their employees, I also know some sizable judgments by employees have punished those retailers. While I know some police departments use them to test their officers, that use is much less now than in the past. Those same police departments may still use those machines for coercion and manipulation of suspects  the mere mention of them can sometimes bring forth a valid, true confession  the results of one taken are not admissible in courts.
My first real acquaintance with lie detectors came from the case of Butler v. State, 228 So.2d 421 (Fla. 4th DCA 1969) where a state attorney agreed to rely upon a lie detector test in determining the complicity of Butler in a series of rapes. When Butler "passed" the lie detector test the surprised, not to mention chagrined, prosecutor reneged and proceeded to prosecute. Because he had agreed with the defense to abide by the test results, the convictions were overturned.
Scientific analyses to determine the truthfulness of a person's statements have always been attractive to those of us involved in the criminal justice system. From the time of dunking, hot-iron-on-the-tongue, and other such scientific truth-revealing tests, to the nervousness and sweat calculators of modern-day usage, we seek to objectively determine the truth. Nothing like that works yet. Of course, when such an instrument or method is found then it won't be used to aid the jury, it can supplant it. Why have a verdict (Latin for speak the truth, loosely translated) when a machine is better?
There are ways to determine the truth but the use of torture and elaborate machines are not among them.
Truth reveals itself often, though not always, of course, in the words, mannerisms and appearance of the speaker. It is determined through consideration of his interest in the matter, his place at the time of the occurrence, his experience in the matters he speaks about, his training and education, his apparent age and intelligence and the manifold factors we all use, consciously and not, when listening to a story. That is why the jury system and the benefit of wise judges, learned in life and the law, are the only currently valid way to find the truth.
If it is the intent of the pushers of the polygraph to use them merely as a threat over the head of the probationer, then is there any reason to limit the use? An Orwellian system of probationer-funded truth squads can be devised. Everyone who is placed on probation should report once a week to the lie detector center, pay his fee and sit for the test. Anyone "found" to have violated any law is then incarcerated and *914 brought, in due time,[1] before the judge for sentencing. Perhaps to keep the fees low, the more scientific-minded probationers could be trained and required to run the machines. And build them. Of course, only non-probationers could be trusted to interpret the graphs. A whole new industry based upon the criminal justice system. Self-funded and certainly self-perpetuating until the logical extensions of the applications start eating their way into the freedoms we must all be able to enjoy. Such as freedom to work, study at school, congregate together without being examined to see if we've done so within proper legal and moral requirements. Lest some think this farfetched, and admittedly it is, I only respond that only a few years ago, when I was younger in the system, it was deemed almost laughable to think that lie-detectors would find any real place in a justice system.
I would not let the lie detector camel get its nose in the probation hearing tent.
W. SHARP, and THOMPSON, JJ., concur.
W. SHARP, Judge, dissenting.
I agree with the dissenting opinions written by Judge Dauksch and Judge Thompson. There is little I can add to their opinions except to make a practical observation. What if the probationer flunks his or her lie-detector test? What can or should a probation officer do then?
Experts in the field of lie-detectoring agree that such tests are not conclusive. The guilty can fool them and the innocent can flunk them.[1] Thus they are a waste of *915 time and money certainly for the probationer. And to the extent the result of a test may be used to get a defendant's probation revoked, however indirectly and sub rosa that may be accomplished, it is unfair and unjust. Thus, I can only conclude that a condition of probation requiring submission to a lie-detector test should never be imposed, as long as the results of such a test remain scientifically unreliable.[2]
THOMPSON, Judge, dissenting.
I completely agree with this court's research, but differ with the conclusion reached. I yield to the thoroughness of this court's research which demonstrates that "polygraph results have been held inadmissible in Florida to prove guilt" and that "[t]he Supreme Court of Florida also has previously expressed hostility to the use of polygraphs for investigative purposes." I also agree that polygraphs cannot be used to prove a probation violation. See Hart v. State, 633 So.2d 1189, 1190 (Fla. 5th DCA 1994) (Griffin, J., dissenting). What then is the purpose of a twice annual polygraph examination when the results cannot be used to violate probation? This court says that it can be used "for purposes of deterrence and supervision of the probationer." I disagree that a polygraph examination can be used for these two purposes.
To support its position, this court writes that "two other Florida Courts have assumed the validity of a polygraph examination as a condition of probation." Those cases do not stand for the proposition advocated. In Nichols v. State, 528 So.2d 1282 (Fla. 1st DCA 1988), the defendant entered a plea of nolo contendere to six counts involving possession and sale of drugs. One of the special conditions of probation imposed by the trial court was that:
(16) You [Nichols] will submit to and cooperate with a lie detector test, psychological stress evaluation, and/or psychometric tests at any time, and from time to time, whenever so directed by the Probation Supervisor, or any other law enforcement officer.
Id. at 1284. The appellate court struck all of condition 16 as being "overbroad, unnecessarily burdensome or oppressive, or a combination thereof." Id. In dicta, the court did note that it might be reasonable to require Nichols to submit to a polygraph examination; however, the court did not allow that portion of the condition to remain once Nichols objected to it.
In Hockman v. State, 465 So.2d 619 (Fla. 2d DCA 1985), the appellant missed three polygraph examination appointments. She claimed that she missed them because her child was ill on the first examination and because she had no money for the following two examinations. The trial court held that she had violated her probation by missing the examinations. The appellate court reversed, concluding that the state never proved Hockman had the ability to pay for the polygraph tests. The issue was not whether the polygraph examinations were a valid condition of probation, but whether Hockman had the money to pay for them. On appeal, the appellant in Hockman never contested the validity of the polygraph examinations as a condition of probation. She may have stipulated to the condition of probation as part of a plea negotiation or she may have failed to object to the condition at the time of its imposition. Regardless of how it was imposed, the appellant never contested the condition. Because the appellant *916 failed to object timely to its imposition, any error in imposing the condition was waived. Larson v. State, 572 So.2d 1368 (Fla. 1991). In the present case, no waiver occurred because a timely objection was made; therefore, Nichols and Hockman are not applicable.
Additionally, Nichols and Hockman predate Biller v. State, 618 So.2d 734 (Fla. 1993). In Biller, the Florida Supreme Court ruled that conditions of probation which limit constitutional rights of probationers must be "desirable for purposes of rehabilitation." Id. at 734. Adopting the criteria outlined in Rodriguez v. State, 378 So.2d 7 (Fla. 2d DCA 1979), the court ruled that a special condition of probation to which an objection is made is invalid if it:
(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.
Id. at 734-35 (quoting Rodriguez, 378 So.2d at 9). Applying these criteria in this case, I conclude that the polygraph examination is invalid as a special condition of probation because no nexus exists between the crime committed and the condition imposed.
This court frequently has held that there must be a nexus between the crime committed and the condition of probation imposed. In Gomez-Rodriqueq v. State, 632 So.2d 709 (Fla. 5th DCA 1994), the appellant entered a plea of nolo contendere to the offense of purchasing cocaine. We struck the condition that he consume no alcoholic beverages as being not related to this offense because, although the offense was a drug offense, the drug was not alcohol. Gomez-Rodriqueq, 632 So.2d at 710. Similarly, in Peterson v. State, 623 So.2d 637 (Fla. 5th DCA 1993), we struck the special condition that the appellant not use other dangerous substances because the term was vague and not related to the crime for which the appellant was placed on probation, i.e. aggravated assault with a deadly weapon. Again, we held that there was no nexus. Peterson, 623 So.2d at 638; see also Grate v. State, 623 So.2d 591 (Fla. 5th DCA 1993) (striking condition that appellant not enter any bar or consume alcohol). It is incongruous to allow one probationer to consume alcohol (a drug) while on probation when the probationer was convicted of selling cocaine or PCP (drugs) based on the conclusion that there is no nexus between the crime and the condition of probation, and yet to compel another probationer to pay for a polygraph examination which is not related to the crime committed and which cannot be used as a basis for a violation of probation based on the justification that the examination might alert the community control officer to a problem. If the examination results show that the probationer did not answer the questions truthfully, the community control officer may be alerted that something is wrong, but the officer cannot file a violation based upon the results alone. There must be independent evidence. What can the officer do in such a situation? Increase supervision of the probationer? Is that realistic? I think not.
Community control requires 21 contacts with a defendant by the community control officer during a 30-day period. The contacts may be face-to-face meetings, phone calls, surprise visits, or contact with the defendant's family or employer. These contacts are designed to modify the defendant's behavior or to supervise the defendant intensely. Because the purpose of the polygraph examination, as envisioned by this court, is only to alert the community control officer that something is wrong, the examination is superfluous. Do we truly expect that the officer will increase the contacts based upon the reading of the polygraph results? The same result can be obtained by the officer looking the probationer in the face and saying, "I think you are lying to me about your relationship with children." Additionally, the probationer is required to fill out a monthly report under oath. If the probationer lies on the report, that lie is a violation of probation. Once probation is violated, the probationer is subject to the same sentence the probationer could have received at the time of sentencing. Is the polygraph examination going to make the probationer any more truthful or is it going to deter the probationer any more forcefully? No scientific evidence has been presented to suggest that it will.
*917 In this regard, the scientific evidence presented to the trial judge that polygraph examinations deter repeat offenders was speculative at best. The trial court coupled the examination with counselling and noted that "research shows that it is a valid and effective deterrent." Unfortunately, this scientific evidence has not been recognized by Florida courts for the purposes the judge stated, and no basis appears in the record to support the trial court's conclusion.
At one time, trial judges required probationers to give blood to the local blood bank as a condition of probation if they were not able to pay a fine. Often, probationers were required to pay a fine and give blood. This condition helped the community by keeping available a continuous pool of blood donors; however, the condition later was determined to be intrusive and beyond the requirements of rehabilitation. I agree with Judge Dauksch that this condition is just as intrusive and should be stricken. As the condition was timely objected to below, I would strike the condition. For these reasons, I respectfully dissent.
W. SHARP, J., concurs.
NOTES
[1] This precise issue was not raised below, but the contemporaneous objection rule would be inapplicable to an illegal condition of probation. Larson v. State, 572 So.2d 1368 (Fla. 1991).
[2] Delap v. State, 440 So.2d 1242, 1247 (Fla. 1983); Kaminski v. State, 63 So.2d 339 (Fla. 1952). Although not necessarily dispositive, we have considered whether the polygraph has now gained the requisite measure of acceptance in the scientific community. A recent article on polygraph evidence, published in two parts, by Professor Paul C. Giannelli, Forensic Science: Polygraph Evidence: Part I, 30 Crim.L.Bull. 262 (May-June 1994; Forensic Science: Polygraph Evidence: Part II, 30 Crim.L.Bull. 366 (July-Aug. 1994), offers a current survey of both the science and the law pertaining to polygraphs. The author notes that the amount of scientific research conducted in the last ten years has far outpaced all prior efforts. Id. at 270. He reports that some researchers claim a polygraph accuracy rate of 95% or higher, id. at 273, while others report results as low as 64%. Id. at 272. It appears that the use of computers has had a significant and positive effect on polygraph quality control. Id. at 269. Nevertheless, Professor Giannelli concludes that: "The validity of polygraph testing in criminal investigations remains controversial." Id. at 269.
[3] Kaminski, 63 So.2d at 340.
[4] In Farmer v. City of Fort Lauderdale, 427 So.2d 187 (Fla.), cert. denied, 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 86 (1983), the high court said:

The city agrees that polygraph testing is not foolproof and concedes that it could not use any evidence obtained from the test in any subsequent judicial proceeding concerning job dismissal. It argues, however, that information obtained from the test could be used as a basis for further investigation, such as identifying co-conspirators or locating the proceeds of the alleged crime. Any such evidence obtained in such an indirect manner would then be admissible in court. Aside from the questionable relevance of such a procedure in relation to the case sub judice, ... we must hold that the possible investigative benefit of building a case upon the foundation of the results of a polygraph examination is too thin a reed to support a denial of a police officer's right to be subjected to only lawful and reasonable orders.
* * * * * *
As mentioned above, petitioner did answer questions about the incident as he would have been constitutionally required to do under Garrity. To further subject petitioner to the same questions when he is attached to a machine of undemonstrated scientific reliability and validity to obtain test results which could not be used in court, is, we believe not a lawful and reasonable order and can thus not provide a basis for dismissal.
Id. at 190, 191. Farmer, however, was a police officer with a vested property right in his government employment. The defendant sub judice is a convicted sex offender on community control as part of a stipulated downward departure sentence. As such, he is subject to a whole range of requirements that would be considered "unlawful" or "unjust" if applied to a police officer in the employment context.
[5] One of the cases on which Piccinonna relied was Commonwealth v. A Juvenile, 365 Mass. 421, 313 N.E.2d 120 (1974), in which the Supreme Judicial Court of Massachusetts had approved the evidentiary use of polygraphs for certain purposes. Ironically, three months after Piccinonna, the Massachusetts court receded from its earlier position. Commonwealth v. Mendes, 406 Mass. 201, 547 N.E.2d 35 (1989).
[6] In fact, our opinion in Hart stands virtually alone in its categorical rejection of the use of polygraphs as a condition of probation.
[7] The Florida Supreme Court standard form order of probation requires the probationer to "promptly and truthfully answer all inquiries directed to you by ... the [probation] officer." Fla.R.Crim.P. 3.986.
[8] Other courts have approved such a condition in order to assure the probationer is avoiding contact with young people. Sejnoha, 512 N.W.2d at 601. It is conceivable that such a question might appropriately warrant the invocation of the privilege against self-incrimination. If so, as with any other question, it may be invoked.
[9] This limitation does not eliminate the utility of polygraphs, however. As the dissent in Hart observed:

A "false" answer may not be a basis to violate the offender's probation, but it certainly would offer a reasonable basis for the probation officer to enhance his supervision of the probationer and prevent further crimes. Or, perhaps, through investigation or more careful scrutiny, admissible evidence that the probationer has, in fact, violated the terms of his probation by perpetrating further sex crimes could be uncovered. In other words, failing the polygraph would simply alert the probation officer that the probationer needs attention. As a means of husbanding the system's badly overtaxed resources, this might help monitor the probationer.
Hart, 633 So.2d at 1190. See also Owens, 681 F.2d at 1369.
[1] Mr. Polodna (defense counsel): My client would object to the polygraph examination. Additionally, I would ask the court to allow my client to remain out while getting signed up for community control.
[1] Bond is optional in probation violation cases. §§ 948.06(1), (3), Fla. Stat. (1993).
[1] McKenzie v. State, 653 So.2d 395 (Fla. 4th DCA 1995) (noting that study done for the U.S. Department of Justice concluded that even if specific testing conditions and operator training requirements were met, the accuracy rate was only 90%); United States v. Piccinonna, 885 F.2d 1529 (11th Cir.1989) (Johnson, J., concurring in part and dissenting in part) (noting that studies show that examinees can successfully use countermeasures (techniques for fooling the polygraph) to create false negatives and thus clear themselves of any suspicion; one could also tell the truth and think of something painful and the truth may appear on a polygraph as a lie); Hester v. City of Milledgeville, 598 F. Supp. 1456 (M.D.Ga. 1984), affirmed in part and reversed in part, 777 F.2d 1492 (11th Cir.1985) (report that a 1977 confession-verified study of law enforcement polygraphers revealed a false positive rate of 49%, or 49% of the tested persons being falsely reported as deceptive); United States v. Gipson, 24 M.J. 246 (C.M.A. 1987) (a number of studies suggest that when polygraph operators err, they have a greater tendency to identify "false positives," that is, they are more likely to label a truthful subject a liar than vice versa); Richard O. Arther, The Use of the Polygraph By Attorneys, 820 Practicing Law Institute/Corporate Law and Practice Course Handbook Series 389 (1993) (the polygraph is not an automatic lie detector and is only as good as the expert operating it; in addition, if there is something seriously wrong with the person taking the examination  either physically or mentally  an "indefinite" opinion will possibly result; this happens about 5% of the time); Patricia Gillette and Eric Tate, An Analysis of Wrongful Termination and Common Law Claims Related to the Workplace, 508 Practicing Law Institute Lit. and Admin. Practice Course Handbook Series 641 (1994) (noting that the Office of Technology Assessment has questioned the validity and reliability of polygraphs in detecting the honesty of employees or job applicants, concluding that the scientific validity of polygraph tests for personal security screening was not established by available research evidence); Kenneth W. Graham, Jr., Federal Practice and Procedure § 5169 (1978) (even if scientific theory behind polygraphs is valid and the machine works, polygraph evidence is of dubious value if the expert who interprets the results lacks the requisite skills. "A properly tuned piano is an instrument upon which it is theoretically possible to play the "Moonlight Sonata," but whether we get that or "Chopsticks" depends upon who is seated at the keyboard."); Jill Rosenberg, Trends in Wrongful Termination Law and Common Law Tort Claims, 508 Practicing Law Institute Lit. and Admin. Practice Course Handbook Series 695 (1994) (roughly half the states have enacted polygraph restrictions or prohibitions); Michael Tiner and Daniel J. O'Grady, Lie Detectors in Employment, 23 Harv.C.R.C.L.L. 85 (1988) (noting that Office of Technology assessment review of field studies of polygraphs showed false negatives (incorrectly classifying a deceptive person as truthful) varied from 29.4% to 0%; false positives (incorrectly classifying a truthful person as deceptive) varied from 75% to 0% and inconclusive results varied from 25% to 0%); 22 Charles A. Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure § 5169 (1994 Supp.) (noting that one expert has estimated chances that a polygraph introduced in court is accurate are not better than 50-50); Note, Lie Detectors in the Workplace: The Need for Civil Actions Against Employees, 101 Harv. L.Rev. 806 (1988) (a fundamental problem with polygraph testing is its inability to make correct and consistent determinations of a subject's truthfulness; a truthful subject may become very nervous and fearful when asked personal or crime-related questions and thus erroneously be labeled as deceptive while conversely a subject who is lying may be adept at controlling his emotions and/or his physiological response and may be erroneously certified as truthful); I McCormick on Evidence § 206 (John W. Strong ed. 1992) (at best, polygraph registers physiological correlates of anxiety, which is not the same thing as consciousness of guilt or lying; questions can provoke inner turmoil even when they are truthfully answered).
[2] Davis v. State, 520 So.2d 572 (Fla. 1988) (factors contributing to the results of a polygraph test  the skill of operator, the emotional state of the person tested, the fallibility of the machine and the lack of a specific quantitative relationship between physiological and emotional states are such that the polygraph cannot be recognized as a sufficiently reliable or valid instrument to warrant its use in judicial proceedings unless both sides agree to its use).