990 P.2d 1171

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**William K. NAONE, Defendant–Appellant.**

**No. 20944.**

Intermediate Court of Appeals of Hawai'i.

Dec. 2, 1999.

As Amended Dec. 3 and Dec. 17, 1999.

Certiorari Denied Dec. 27, 1999.

Christopher R. Evans, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

This appeal requires us to examine the propriety of conditioning the granting of a deferred acceptance of nolo contendere (DANC) plea on a defendant's attendance at a sex offender treatment program that requires submission to periodic polygraph testing. Defendant–Appellant William K. Naone (Defendant) contends that the Family Court of the First Circuit (the family court) reversibly erred when, upon his termination from the Hawaii Sex Offender Treatment (HSOT) Program for failure to submit to polygraph testing, it revoked his DANC status and entered a new judgment, convicting and sentencing him for committing three counts of Sexual Assault in the Third Degree against his minor daughter, in violation of Hawai'i Revised Statutes (HRS) § 707–732(1)(b) (1993).[1]

We disagree with Defendant.

## PROCEDURAL BACKGROUND

### A. *Defendant's First Two Appeals*

Following Defendant's indictment on three counts of third degree sexual assault in March 1990, a jury found Defendant guilty as charged on October 26, 1990. Pursuant to a January 25, 1991 Judgment, Defendant was sentenced, among other things, to serve a five-year term of probation and a concurrent six-month term of imprisonment and to "immediately undergo a psychosexual assessment by Dr. Craig Robinson at [Defendant's] expense, attend and participate in such counseling as required by [Defendant's] probation officer until clinically discharged." Defendant appealed the January 25, 1991 Judgment (Defendant's first appeal), and on May

13, 1993, this court vacated Defendant's conviction and sentence and remanded the case for a new trial.

On June 13, 1994, just prior to the date that his new trial was to commence, Defendant filed a motion to dismiss the indictment, arguing that Plaintiff–Appellee State of Hawai'i (the State) had used a "script" to question Defendant's daughter, the complaining witness, during grand jury proceedings. The family court denied that motion, as well as Defendant's oral motion to dismiss the indictment due to the wording of the indictment and Defendant's oral motion to reconsider Defendant's motion to dismiss (collectively, the three motions).

On June 15, 1994, following the family court's denial of the three motions, Defendant entered a conditional DANC plea, reserving the right to appeal the family court's rulings on the three motions. On June 16, 1994, the family court granted Defendant's DANC plea and entered an order deferring proceedings against Defendant for a period of thirty months (the 1994 DANC Plea Order). Defendant thereafter appealed the family court's rulings on the three motions (Defendant's second appeal), and by summary disposition order dated July 1, 1997, this court affirmed.

### B. *The 1994 DANC Plea Order*

The 1994 DANC Plea Order required that Defendant "be under the supervision of the Adult Probation Division, and ... comply in all respects with [specified] terms and conditions" during the period of deferral of further proceedings. Additionally, the order imposed the following Special Condition No. 1 upon Defendant:

> You shall attend and participate in such counseling, including sex offender treatment, as required by your probation officer until clinically discharged.
>
> . . . .
>
> (b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]

---

1. As it did when the indictment was returned, Hawai'i Revised Statutes (HRS) § 707–732 (1993) provides, in pertinent part:

    **Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:

Following the entry of the 1994 DANC Plea Order, Defendant's probation officer referred Defendant to various sex offender treatment programs for counseling. However, because all of these programs required Defendant to admit his guilt and undergo polygraph testing, Defendant objected, on Fifth Amendment grounds, to placement in such programs. Noting that Special Condition No. 1 did not specifically require placement in a program that required periodic polygraph testing as part of treatment, Defendant requested placement, instead, in a program where polygraph testing was not required.

On November 30, 1994, the State filed the first of three motions to set aside the 1994 DANC Plea Order. This first motion was based on Defendant's alleged failure to comply with Special Condition No. 1—that he participate in sex offender treatment. Following a show cause hearing held on January 6, 1995, the family court orally denied the motion and ordered Defendant to enter a sex offender treatment program approved by his probation officer within sixty days. The family court also ordered Defendant's probation officer "to check whether Dr. Yuen,[2] whom [Defendant] is now seeing for sex offender treatment, is a viable counselor" and "to check into a sex offender treatment program that doesn't require [Defendant] to take a polygraph." (Footnote added.)

On March 28, 1995, the State filed a second motion to set aside the 1994 DANC Plea Order on the basis that Defendant had violated Special Condition No. 1 by failing to enroll in a sex offender treatment program, as ordered on January 6, 1995. In a memorandum in opposition to the motion, Defendant explained that although he had located a psychologist who was willing to provide him sex offender treatment without the use of polygraph examinations, Defendant had been informed by his probation officer that the psychologist did not conduct group sessions and, accordingly, was disqualified from providing such treatment. Defendant stated

that he had been voluntarily seeing Dr. Robert C. Marvit (Dr. Marvit), a psychiatrist, for treatment, and Dr. Marvit was willing to design and outline a recommended treatment plan for Defendant that was in accordance with any requirements of the family court. Defendant also mentioned that he had offered to enter into a stipulation with the State "that any lie detector test or admission of guilt would not be used against [him] in this proceeding or any other proceeding[.]" However, the State did not respond to his offer and no stipulation was agreed upon.

Subsequently, the family court approved and filed the following written stipulations between the parties: (1) a stipulation dated July 7, 1995 and filed on September 15, 1995 that "any statements made, or written documents signed by [Defendant] for treatment regarding the incident or related to the incident ... will not be used in this proceeding or any other proceeding against him"; and (2) an October 6, 1995 stipulation that Defendant "will continue treatment on an individual basis with Dr. ... Marvit ... according to the terms and conditions established by Dr. Marvit. Additionally, Defendant ... will immediately begin to receive group therapy treatment from a provider who is approved of by [Defendant's] probation officer[.]"

On March 19, 1996, approximately five months after the foregoing stipulations were filed, the State filed a third motion to set aside the 1994 DANC Plea Order, on grounds that Defendant had been terminated from the sex offender treatment program that he had been directed to attend by his probation officer, "for non-compliance, per a letter dated February 27, 1996, from [Defendant's] therapist, Mr. Joseph Giovannoni [ (Mr. Giovannoni) ]." At a show cause hearing on May 15, 1996, Mr. Giovannoni testified that Defendant was terminated from the program on February 27, 1996 for "noncompliance for refusing to comply with the polygraph, a treatment intervention."

C. *The Order Setting Aside the 1994 DANC Plea Order*

On May 15, 1996, the family court granted the State's third motion and entered an order

2. According to the record on appeal, Adrian Yuen, Ph.D. [ (Pastor Yuen) ] was the senior pastor of the church that Defendant–Appellant William K. Naone (Defendant) attended.

setting aside the 1994 DANC Plea Order on the basis that Defendant "inexcusably failed to comply with a substantial requirement of the [1994 DANC Plea] Order" (the Order Setting Aside the 1994 DANC Plea Order).[3]

3. In sentencing Defendant, the Family Court of the First Circuit (the family court) stated:

> Well, I've reviewed the entire file in this case and the only law or statutory law that I can find applicable is [HRS §] 853-3 which says: "Upon violation of a term or condition set by the court for deferred acceptance of guilty plea or deferred acceptance of nolo contendere [(DANC)] plea, the court may enter an adjudication of guilt and proceed as otherwise provided."
>
> I note that this particular statutory section does not even require a willful or inexcusable violation of a term or condition of probation. Who knows, the appellate court may say it's implied, but I tend to think that the deferred acceptance of guilty or no contest plea program is different or supposed to be different than probation. And perhaps the [l]egislature intended that it would be easier to revoke such—such an order.
>
> Whatever the case is, let me just document for the record the facts that I—I find important in this case. All right?
>
> The [DANC] plea was granted back on June 15th, 1994. The day after the plea was granted[, Defendant] reported to the probation office and was referred to Stephen Holbrook [(Holbrook)] and Connie Brinton [(Brinton)] for sex offender treatment.
>
> About two weeks later, on June 30th, he told the probation officer that he would not sign a Disclosure of Information form for the Catholic Charities or Holbrook based on his Fifth Amendment claims. On July 19th, the probation officer learned that [Defendant] was terminated from treatment with Holbrook because he refused to take a polygraph.
>
> On August 30th, the probation officer learned from Brinton that she could not provide treatment for [Defendant] because he refused to take a polygraph exam.
>
> On September 22nd, [Defendant] was told by the probation officer that he had to be in sex offender treatment by October 22nd or revocation would follow. [Defendant] was referred to [Dr.] Craig Robinson [(Dr. Robinson)] and Joseph Giovannoni [(Mr. Giovannoni)] for treatment. [Defendant] refused to undergo an assessment required by [Dr.] Robinson because he claimed he already did one and refused to pay Mr. Giovannoni a hundred-twenty dollars because he didn't know what he was buying, according to him.
>
> On October 20th, he contacted the person he's referred to as Pastor Yuen.
>
> On January 6th, 1995, I ordered him to enter a sex offender treatment program within sixty days. As of March 23rd, 1995, he had not yet entered any sort of sex offender treatment program. In the meantime, between February 10th, 1995, and March 14th, 1995, there is some evidence that he—he consulted Pastor Yuen and a person by the name of Michael Bresson (phonetic).
>
> Now, actually [Defendant] did not get into any sort of treatment until approximately April 25th, 1995, when he went to see [Dr. Robert C.] Marvit [(Dr. Marvit)], who testified today. So he was really able to stay out of treatment for ten months for giving various reasons.
>
> [Plaintiff–Appellee State of Hawai'i (the State)] had moved to revoke and I had denied the motion, giving [Defendant] an opportunity, sixty days, to get into another program. What does he do? He doesn't get into another program within sixty days. He still continues to make excuses. And then finally when they file another motion to revoke, he—he starts treatment with [Dr.] Marvit.
>
> Now, after that[,] the State filed—well, before he began treatment with [Dr. Marvit], the State filed another motion to set aside this [DANC] plea, and as a result of that and my concern at the time was the specificity of the original order in this case may not have been fair to [Defendant] to give him the benefit of the doubt as to what he believed was required under his probation.
>
> And so I think counsel and I got together and decided that we should try to specify in more detail just what [Defendant's] responsibilities were. And this to me is very unusual, but we did it.
>
> And on September, or excuse me, October—well, there is a stipulation filed on September 15th, 1995, which is signed by [defense counsel] and [the deputy prosecutor], that provides that any statements made or written documents signed by [Defendant] for treatment regarding the incident or related to the incident in the above-entitled matter will not be used in this proceeding or any other proceeding against him.
>
> Then on October 6, 1995, a second stipulation, this one signed by [Defendant] himself, was filed and that is entitled Stipulation Between Parties Regarding the Treatment Plan for [Defendant]. In that stipulation it is provided that the individual treatment will be conducted according to the terms and conditions established by [Dr.] Marvit. Fine, that's one-half.
>
> The other half was [that] additionally[, Defendant] will immediately begin to receive group therapy treatment by from [sic] a provider who is proved by—approved of by [Defendant's] probation officer, Karen Okamoto.
>
> Now, shortly after that, I guess on October the 25th, 1995, [Defendant] went and signed

The family court thereafter accepted Defendant's nolo contendere plea, adjudged Defendant guilty as charged, and sentenced him to five years' probation for each of the three counts, to run concurrently.[4] The family

up with Mr. Giovannoni's group treatment program, X'd out a number of conditions of the group rules including the rule requiring him to undergo a polygraph examination. From his review of the group rules and his crossing them out, I'm going to find that he knew very well that part of the program, a requirement of the program, was to take a polygraph examination as well as a whole bunch of other things that he crossed out.

[Defendant,] your understanding of probation seems to be upside-down. It's not you that determines the conditions of your probation, it's the [c]ourt and the probation officer. The first order in this case said you go to sex offender treatment as directed by—as required by your probation officer. And you knew she required you to go but you kept making excuses. Up until now you still don't want to take the polygraph examination.

You know, I have to tell you every time they file a motion to revoke your DANC plea, they recommend me putting you in prison for at least five years. Everytime [sic] they did that, I gave you the benefit of the doubt. I'm not going to do it anymore. I gave you enough opportunities.

The polygraph was something you were required to do as part of group therapy. You agreed to get into the group therapy. You were warned that if you didn't take the polygraph you would be out of group therapy and you knew that if you were out of group therapy, you were in violation of your DANC plea program. What can I do?

Even though I don't have to find that you willfully and inexcusably violated this condition, I see a lot of evidence, I see more than enough evidence to find that you willfully and inexcusably violated this condition after all the chances that I gave you.

And it seems to me not only in open court from the very first time I granted the motion for [DANC] plea, you agreed to go into sex offender treatment. And then at subsequent revocations, you always said you're going to do what needs to be done. But when you get down to doing it, you always have some excuse, no, the [c]ourt didn't say so. You were ordered to follow the instructions of your probation officer.

Now, based on all of these findings, I'm going to grant the motion to set aside the order for [DANC] plea and I'm going to accept [Defendant's] plea, find him guilty of Sex Assault in the Third Degree of counts I, II, and III in this case.

4. In sentencing Defendant, the family court said, in part:

I've reviewed just about every probation case that the [Hawai'i] Supreme Court or the [Intermediate Court of Appeals] has decided and, you know, they say if you're showing some progress[,] then maybe you deserve to stay out of prison. But there's going to come a time, [Defendant], where I got to give up, I got to think about the welfare of the community as well as your welfare and your rehabilitation, I got to think about the danger you might present to someone else.

And I got to think about how well you're progressing in your treatment. And if you're not progressing in treatment, I have to assume that you're going to maybe do this again sometime and then the only way to protect the community is to put you in prison for at least five years. Okay?

But I'm not going to do it right now. And—and believe me, [Defendant], I know I've said it before but this time it's your last shot. I'm going to make it very clear what you're going to have to do. And if you don't do it, there will be no excuses, you're going to prison, that's all. It's as simple as that.

So you'll be placed on probation for a period of five years in each count subject to all of the mandatory terms and conditions of probation and the following special conditions. . . .

. . . .

You are to participate satisfactorily in the [Hawaii Sex Offender Treatment (HSOT)] Program with the provision that you obtain and maintain sex offender treatment including compliance with all of the group rules applicable to the program. Those are the rules, [Defendant], that you signed on October 25th[, 1995] but crossed out a number of them. I'm ordering you specifically to comply with each and every one of those group rules so there's no question.

You shall also comply with program requirements that are reasonably related to sex offender treatment including undergoing polygraph or penile pathismograph [sic] examinations and participating in group therapy as directed, all as approved by the Adult Probation Division at your own expense until clinically discharged with the concurrence of the Adult Probation Division. . . .

. . . .

[Defendant], your compliance with all of these conditions, especially what seems to be the problem in this case, the group rules of the [HSOT] Program, all those things are required now. And you better comply with them because if you don't, then I don't have any alternative.

. . . .

. . . [Y]ou're going to have to make a better showing than made so far. There is nothing more for me to do. If you insist on refusing to comply, I'm going to have no choice. Okay? I hope you understand that.

court also ordered, as a special condition of probation, that Defendant:

I.    participate satisfactorily in the [HSOT] Program with the provision that he obtain and maintain sex offender treatment, comply with each and every group rule of the HSOT [Program], including but not limited to undergoing polygraph and/or plethysmography examinations as directed, and any other HSOT [Program] directive that is reasonably related to sex offender treatment, all as approved by the Adult Probation Division (APD), at his own expense until clinically discharged with the concurrence of the APD; monthly progress reports are to be submitted to the APD by the therapist. If deemed by the APD to be financially unable to pay, [Defendant] shall participate in treatment by a Judiciary contracted therapist with payment to be made in accordance with the APD formula[.]

Defendant took three actions in response to the Order Setting Aside the 1994 DANC Plea Order. First, on June 7, 1996, he filed a "Motion for Reconsideration of [the Order Setting Aside the 1994 DANC Plea Order] and Judgment of Conviction and Sentence, and in the Alternative, for Correction of an Illegal Sentence" (the Motion for Reconsideration). Second, on June 10, 1996, Defendant filed a notice of appeal from the Order Setting Aside the 1994 DANC Plea Order and the Judgment of Conviction and Sentence (Defendant's third appeal). Finally, on July 11, 1996, Defendant filed a "Motion to Set Aside Entry of Nolo Contendere Plea."

At a hearing held on August 23, 1996, the family court ruled that in light of Defendant's third appeal, it no longer had jurisdiction and, accordingly, orally dismissed Defendant's Motion for Reconsideration and Motion to Set Aside Entry of Nolo Contendere Plea. On September 5, 1996, however, the Hawai'i Supreme Court temporarily remanded the appealed case to the family court to hear and determine promptly (1) the Motion for Reconsideration, and (2) the Motion to Set Aside Entry of Nolo Contendere Plea. Since these two motions had already been dismissed by the time the case was remanded, Defendant filed a new Motion for Reconsideration, as well as a new Motion to Set Aside Entry of Nolo Contendere Plea.

D.    *The 1996 Amended DANC Plea Order*

Following a hearing on the two motions, the family court, on September 30, 1996, denied Defendant's Motion to Set Aside Entry of Nolo Contendere Plea but partly granted Defendant's Motion for Reconsideration. The family court reinstated Defendant's DANC plea and issued an Amended Order Granting Defendant's Motion for DANC Plea (the 1996 Amended DANC Plea Order), whereby it deferred further proceedings against Defendant for forty-six months nunc pro tunc to June 16, 1994, placed Defendant under the supervision of the APD, and subjected Defendant to the usual terms and conditions of deferral and the following special conditions:

a.    [Defendant shall] follow all reasonable instructions given to your [sic] by your probation officer;

b.    [Defendant] shall participate satisfactorily in the [HSOT] Program with the provision that he obtain and maintain sex offender treatment as approved by the [APD] at his own expense until clinically discharged with the concurrence of the APD; monthly progress reports are to be submitted to the APD by the therapist. If deemed unable to pay, [Defendant] shall participate in treatment by a Judiciary contracted therapist with payment to be made in accordance with the APD payment formula;

c.    [Defendant] shall comply with each and every one of [Mr.] Giovannoni's written Relapse Prevention Group Rules, including but not limited to undergoing periodic polygraph examinations as directed by [Mr.] Giovannoni, unless

compliance is excused in writing by the APD;

d. [A]ny statements made, or written documents signed, by [Defendant] during sex offender treatment and pertaining or relating to the incidents that gave rise to the above-entitled matter may not be used against him in this proceeding or any other proceeding.

The family court also issued Findings of Fact, Conclusions of Law, and Order, which detailed the procedural history of this case, addressed the legal issues raised by Defendant, and explained the court's reasons for issuing the 1996 Amended DANC Plea Order. Of pertinence to this appeal are the following findings of fact and conclusions of law:

## FINDINGS OF FACT

. . . .

23. Based on the evidence adduced at the May 15, 1996 and September 27, 1996 hearings, the [family] court further finds as follows:

a. Although [Defendant] has continuously participated in individual therapy with Dr. Marvit since on or about April 25, 1995, he had not participated in sex offender treatment "required by his probation officer" until he enrolled in [Mr.] Giovannoni's group therapy program in October of 1995.

b. Defendant was advised by [Mr.] Giovannoni upon his entry into the group therapy program that submitting to periodic polygraph examinations was a requirement of that program.

c. Defendant was warned on several occasions between October 24, 1995 and February 27, 1996, both orally and in writing, that his refusal to undergo a polygraph examination would result in his termination from the group program.

d. Despite these warnings, [Defendant] refused to submit to a polygraph examination at any time prior to the hearing on the

motion to set aside the [DANC plea] held on May 15, 1996.

e. The primary reason for his termination from the group program was [Defendant's] refusal to undergo a polygraph examination.

f. The polygraph is a valuable and effective tool in treating sex offenders because:

(1) It is generally useful in monitoring a sexual offender's progress in therapy and compliance with treatment requirements;

(2) It aids the therapist in confronting and overcoming the common tendency of sex offenders to deny wrongdoing by promoting truthfulness and a willingness to take responsibility for negative behavior and correct the "thinking errors" that caused that behavior, all of which are essential to effective treatment and the prevention of recidivism;

(3) It has in fact greatly diminished the recidivism rate of offenders who have submitted to it; and

(4) It may on occasion support the truth of a therapy participant's denial of wrongdoing and result in the clinical discharge of that participant.

g. Use of the polygraph is approved and recommended by the Association for the Treatment of Sexual Abusers, a national organization dedicated to the advancement of professional standards and practices in the field of sexual offender evaluation and treatment.

h. All participants in [Mr.] Giovannoni's group therapy program, which is conducted as part of the [HSOT] Program, are required to submit to periodic polygraph examinations.

i. [Defendant's] refusal to submit to polygraph examinations jeopardizes the effectiveness of not only [Defendant's] individual treatment program, but the [HSOT] Program overall, because [Defendant's] refusal may encourage others in the program at large to refuse as well.

j. Since his enrollment in the group program, [Defendant] has consistently attended weekly therapy sessions with few, if any, unexcused absences, paying [Mr.] Giovannoni at least $45 for each session.

k. At [Mr.] Giovannoni's invitation, [Defendant] has continued to attend weekly therapy sessions after his "termination" on February 27, 1996 and, as of July 30, 1996, had paid [Mr.] Giovannoni a total of more than $2000.

l. The polygraph issue aside, the therapy methods used with respect to [Defendant] in group sessions prior to his "termination" on February 27, 1996 have not changed in any significant way in the group sessions he has attended since that date.

m. On June 3, 1996, [Defendant] submitted to, and paid $125 for, a polygraph examination.

## CONCLUSIONS OF LAW

### I. THE MOTION FOR RECONSIDERATION OF ORDER SETTING ASIDE [DANC PLEA] OR ALTERNATIVELY FOR CORRECTION OF ILLEGAL SENTENCE

. . . .

#### C. *The Polygraph Requirement*

1. Defendant argues that: (a) requiring him to submit to a polygraph examination as a condition of the [DANC plea] violates his privilege against self-incrimination; and (b) in refusing to submit to a polygraph examination, [Defendant] did not violate a substantial condition of his [DANC plea].

2. The September 15, 1995 stipulation prohibiting the future use of statements made, or written documents signed, by [Defendant] during treatment concerning the incidents involved in this case adequately protects his privilege against self-incrimination.

3. While submission to a polygraph examination was not expressly made a condi-

tion of the [DANC plea], [Defendant's] refusal to submit to one gave rise to his termination from the group therapy program on February 27, 1996.

4. The use of the polygraph is reasonably related to sex offender treatment, relapse prevention, and rehabilitation of sex offenders.

5. Therefore, requiring [Defendant] to submit to periodic polygraph examinations as part of his sexual offender group therapy program was neither unreasonable nor arbitrary. *Cf. State v. Nakamura,* 59 Haw. 378, 581 P.2d 759 (1978).

6. Therefore, terminating [Defendant] from the group therapy program for refusing to submit to a polygraph examination after repeated warnings that refusal would result in termination was also neither unreasonable nor arbitrary. *Id.*

#### D. *Whether ... Defendant Violated a "Substantial" Condition of the [DANC Plea]*

1. Special Condition No. 1 was the *only* special condition imposed on [Defendant] pursuant to the [DANC plea] order.

2. Given the nature of the offenses charged against [Defendant], the obligation to attend and participate until clinically discharged in sex offender treatment required by his probation officer was certainly a substantial condition of the [DANC plea].

3. The evidence indicates, however, that, since his "termination" from the group therapy program on February 27, 1996, [Defendant] has not only consistently attended and participated in weekly group therapy sessions, he has paid a substantial sum of money for these sessions, and further, that the therapy he has undergone during the group sessions he has attended since February 27, 1996 has not differed significantly from the therapy he underwent prior to "termination."

4. This evidence raises the question [of] whether [Defendant] can fairly be held

to be in violation of a condition that requires him to "attend and participate in sex offender treatment as required by his probation officer until clinically discharged" when, although issued a formal termination letter, he continues to pay for, attend, and participate in a sex offender group therapy program required by his probation officer—a question that [the family] court admittedly overlooked at the time of the May 15, 1996 hearing.

5. While not wishing to condone or excuse [Defendant's] deliberate refusal to submit to a polygraph examination that he knew was required by the group program rules, thereby possibly undermining the efficacy of the [HSOT] Program as a whole, the [family] court sees little benefit in discouraging [Defendant's] continued attendance and participation in group therapy under the circumstances presented by this case.

6. Both the interest in requiring [Defendant] to comply with group program rules and, given partial noncompliance, the interest in having him continue in therapy without generating uncertainty in the application of Special Condition No. 1, as originally worded, can be accommodated by amending the condition to specify a particular treatment program and expressly making compliance with the requirements of that program a condition of the [DANC plea].

7. Therefore, on reconsideration of the facts of this case, the [family] court concludes that the Order Setting Aside Order Granting Motion for [DANC] Plea and Judgment of Conviction and Sentence entered on May 15, 1996 should be set aside and [Defendant's DANC plea] reinstated subject to the entry of an Amended Order Granting Motion for [DANC] Plea that will: (1) modify the language of what is now Special Condition No. 1 to require [Defendant] to participate satisfactorily in the [HSOT] Program; (2) expressly require compliance with [Mr.] Giovannoni's Relapse Prevention Group Rules as a condition of the [DANC plea]; (3) incorporate

the substance of the stipulation filed on September 15, 1995 prohibiting the use of statements made by [Defendant] during treatment; and (4) enlarge the term of the [DANC plea] from thirty to forty-six months to account for the sixteen-month period between June 16, 1994 and October 24, 1995 during which [Defendant] was not attending or participating in sexual offender treatment required by his probation officer.

(Original brackets omitted; emphasis in original.)

On October 9, 1996, Defendant filed two motions: (1) Motion for Modification of Terms and Conditions of his DANC Plea (to have Mr. Giovannoni removed as Defendant's sex therapist and to allow Dr. Marvit to serve as Defendant's primary and only therapist), and (2) Motion for Reconsideration of the 1996 Amended DANC Plea Order (specifically, the period of deferral for forty-six months nunc pro tunc to June 16, 1994). These motions were denied by the family court at a hearing held on July 11, 1997.

On January 3, 1997, the State filed a motion to set aside the 1996 Amended DANC Plea Order, on grounds that Defendant violated special condition "b" of the order by "fail[ing] to participate satisfactorily in the [HSOT] Program by being terminated from his sex offender treatment program on November 6, 1996." Following a hearing on July 11, 1997, the family court granted the State's motion and entered judgment convicting Defendant of the three sexual assault in the third degree charges and sentencing him to five years' imprisonment for each count, to run concurrently.

In sentencing Defendant, the family court stated:

All right. [Defendant], you pleaded no contest to three counts of sexually assaulting your own daughter. These offenses indicate to me a risk of danger. You present a risk of danger to the community. Initially, or years ago when this case first started, the risk—I felt the risk could be

dealt with either by removing from you [sic] the community entirely or by requiring close supervision and treatment within the community.

I chose the second alternative hoping that you would participate meaningfully in and benefit from court-ordered sex offender treatment. I granted the deferred plead [sic], in my mind, as an additional incentive for you to comply because if you did comply, no conviction would be entered on your record.

You had that opportunity, [Defendant], but from the beginning and continuing right now to the present time, you have refused to fully comply with the requirements of your court-ordered treatment. You have been resistive and uncooperative. As Mr. Giovannoni indicates, you're not amenable to relapse prevention treatment and you have constantly failed to demonstrate any progress in therapy. This is so despite the [family] court's [sic] having given you several opportunities to demonstrate good-faith compliance.

I'm convinced now, after all that's occurred in this case, that you do not want to comply and you will not comply with court-ordered treatment conditions within the community. You haven't demonstrated any significant progress in connection with your treatment and that being the case, I've got to consider that you're as much of a risk to the community as you were at the time of the original disposition of this case.

You not being amenable to supervision within the community, the only alternative left for me is to remove you from the community. Therefore, I'm going to commit you to the Director of Public Safety for five years in Counts I, II and III, all terms to run concurrently, the mittimus to issue forthwith unless there's a good reason to postpone it.

On July 15, 1997, Defendant filed two motions: (1) a motion to stay execution of his sentence until his appeal was decided, and (2)

a motion for reconsideration of his sentence. Following a hearing on these motions held on July 18, 1997, the family court denied the motion to stay execution but granted the motion for reconsideration, reducing Defendant's prison term to six months. In an Order of Resentencing dated July 24, 1997, the family court sentenced Defendant to five years' probation, "[s]ubject to all the mandatory terms and conditions of probation and the attached special conditions." Item 7 of the special conditions required, in part, that Defendant shall [5]:

b. be committed to the custody of the Director of the Department of Public Safety for a period of six (6) months of jail confinement, effective immediately;

c. participate satisfactorily in the [HSOT] Program with the provision that [Defendant] obtain and maintain sex offender treatment as approved by the [APD] at his own expense until clinically discharged with the concurrence of the APD; monthly progress reports are to be submitted to the APD by the therapist. If deemed unable to pay, [Defendant] shall participate in treatment by a Judiciary contracted therapist with payment to be made in accordance with the APD payment formula;

d. [D]efendant shall comply with each and every one of [Mr.] Giovannoni's written Relapse Prevention Group Rules, including but not limited to undergoing periodic polygraph examinations as directed by [Mr.] Giovannoni, unless compliance is excused in writing by the APD;

e. any statements made, or written documents signed, by [Defendant] during sex offender treatment and pertaining or relating to the incidents that gave rise to the above-entitled matter may not be used against him in this proceeding or any other proceeding.

. . . .

On August 11, 1997, Defendant filed a Motion for Reconsideration of Sentence and

---

**5.** These terms and conditions of probation are the same ones imposed on Defendant when the family court reinstated Defendant's DANC plea on September 30, 1996.

in the Alternative, for Reconsideration of Stay of Execution of Sentence (Defendant's August 11, 1997 Motion for Reconsideration). On September 2, 1997, Defendant filed his notice of appeal from the Judgment filed on July 11, 1997, as amended by Judgments filed on July 22 and 24, 1997 (Defendant's fourth appeal). Defendant's August 11, 1997 Motion for Reconsideration was heard on October 3, 1997, and on October 28, 1997, the family court issued Findings of Fact, Conclusions of Law, and Order denying the motion. The family court specifically found and concluded as follows:

> 1. The jail term that Defendant is currently serving is the result of a substantial reduction of the five-year prison term previously imposed.
>
> 2. In light of [Defendant's] past attitudes and conduct in this case, a further reduction of sentence would frustrate the purposes underlying [HRS § 706–606], especially the need to promote respect for the law.

## APPELLATE JURISDICTION

We initially address the State's contention that we lack jurisdiction to consider this appeal because Defendant filed his notice of appeal on an untimely basis.

Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(b) (1996) provides, in pertinent part, that

> [i]n a criminal case, whether the appeal is one of right or is an interlocutory appeal, the notice of appeal by a defendant shall be filed in the circuit or district court within 30 days after the entry of the judgment or order appealed from.... If a timely motion in arrest of judgment or for a new trial on any ground other than newly discovered evidence has been made, an appeal from a judgment of conviction may be taken within 30 days after the entry of an order denying the motion. A motion for a new trial based on the ground of newly discovered evidence will similarly extend the time for appeal from a judg-

ment of conviction if the motion is made before or within 10 days after entry of the judgment.... A judgment or order is entered within the meaning of this subdivision when it is filed with the clerk of the court. Upon a showing of excusable neglect or good cause the circuit or district court may, no later than 30 days after the time has expired, on motion and notice, extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision (b).

■ It is undisputed that judgment in this case was entered on July 11, 1997, as amended on July 22 and 24, 1997, and that Defendant filed his notice of appeal on September 2, 1997, beyond the deadline prescribed by HRAP Rule 4(b). Although the record reflects that Defendant filed a motion to reconsider his sentence on August 11, 1997, such a motion does not qualify under HRAP Rule 4(b) as a tolling motion that extends the filing deadline for a notice of appeal. Therefore, Defendant's appeal was clearly untimely.

■ We note, however, that the Hawai'i Supreme Court has held that in criminal cases where justice so warrants, such as "when ... defense counsel has inexcusably or ineffectively failed to pursue a defendant's appeal from a criminal conviction in the first instance[,]" the deadline for filing a notice of appeal will be relaxed. *State v. Knight*, 80 Hawai'i 318, 323, 909 P.2d 1133, 1138 (1996) (internal quotation marks, internal citations, and original brackets omitted). Thus, notwithstanding the belatedness of this appeal, this court will address the issues raised by Defendant on appeal.

## DISCUSSION

A. *The Validity of the Condition That Defendant Submit to Polygraph Testing*

Defendant steadfastly maintains that he cannot validly be required, as a condition of

the family court's grant of his DANC plea, to submit to polygraph testing as part of a sex offender treatment program. We disagree.

### 1.

We note, first of all, that under the statutory procedures governing DANC pleas set forth in HRS chapter 853 (1993), considerable discretion is vested in a sentencing court to impose reasonable terms and conditions on a defendant seeking to enter a DANC plea. HRS § 853–1 (1993) specifically provides, in relevant part, as follows:

> **Deferred acceptance of ... nolo contendere plea; discharge and dismissal, expungement of records.** (a) Upon proper motion as provided by this chapter:
>
> (1) When a defendant voluntarily pleads guilty or nolo contendere, prior to commencement of trial, to a felony, misdemeanor, or petty misdemeanor;
>
> (2) It appears to the court that the defendant is not likely again to engage in a criminal course of conduct; and
>
> (3) The ends of justice and the welfare of society do not require that the defendant shall presently suffer the penalty imposed by law, the court, without accepting the plea of nolo contendere or entering a judgment of guilt and with the consent of the defendant and after considering the recommendations, if any, of the prosecutor, may defer further proceedings.
>
> (b) *The proceedings may be deferred upon any of the conditions specified by [HRS §] 706–624.* ...

(Emphasis added.)

HRS § 706–624 (1993) sets forth certain mandatory and discretionary conditions that a court is required or permitted to impose on a defendant as a condition of a sentence of probation. Among the listed discretionary conditions that a court may require a defendant to comply with are the following:

> (k) Undergo available medical, psychiatric, or psychological treatment, including

treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

. . . .

> (n) *Satisfy other reasonable conditions as the court may impose*[.]

(Emphasis added.)

In view of the express language contained in paragraph (k), the family court was clearly authorized to require Defendant to attend a psychological or psychiatric sex offender treatment program as a condition of his DANC plea. In light of paragraph (n), moreover, we conclude that the family court was authorized to require Defendant to undergo polygraph testing as a reasonable condition of the granting of his DANC plea.

Courts in other jurisdictions have recognized that where a statutory grant of discretion to impose conditions of probation exists, a polygraph condition of probation may validly be imposed, as long as the condition and the circumstances of its imposition are reasonable. *See* Annotation, *Propriety of Conditioning Probation on Defendant's Submission to Polygraph or Other Lie Detector Testing,* 86 A.L.R.4th 709, § 9(a) at 726–27 (1991).

In *People v. Miller,* 208 Cal.App.3d 1311, 256 Cal.Rptr. 587 (1989), for example, a defendant who pled guilty to committing a lewd and lascivious act upon a child under the age of fourteen was sentenced to probation for five years, on condition that he serve one year in jail, have no contact with the victim or any other minor female unless in the presence of her parent or with the express approval of his probation officer, and submit to polygraph examination at the direction of his probation officer. On appeal, the defendant challenged the condition requiring him to submit to polygraph examination.

The California Court of Appeal for the Third District held that, in light of the broad statutory discretion vested in the sentencing court to prescribe reasonable probation conditions to foster rehabilitation and to protect the public so that justice may be done,

a condition of probation will not be held invalid unless it (1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.

*Id.* at 588–89 (internal quotation marks omitted). Applying the foregoing rules to the facts before it, the *Miller* court concluded that the polygraph condition imposed on the defendant was valid. The court observed:

Defendant pled guilty to a sex crime committed upon a seven[-]year[-]old female. One condition of probation is that he not be alone with young females. As indicated at sentencing, compliance with that condition is difficult to enforce. *The polygraph condition helps to monitor compliance and is therefore reasonably related to the defendant's criminal offense. Because this condition is aimed at deterring and discovering criminal conduct most likely to occur during unsupervised contact with young females, the condition is reasonably related to future criminality.*

*Id.* at 589 (emphasis added).

Similarly, in *Mann v. State*, 154 Ga.App. 677, 269 S.E.2d 863 (1980), the Georgia Court of Appeals held that since the "probation and suspension statutes in Georgia vest broad discretion in trial judges[,] ... we see no logical reason why any reasonable condition imposed for probation or suspension of a sentence by a trial court should not be approved." *Id.* at 866.

2.

A review of the case law from other jurisdictions also reveals that the majority of

courts that have considered the issue have generally upheld the validity of polygraph testing as a condition of a sex offender's probation terms, as long as the polygraph test results are used for investigative or monitoring purposes and not for evidentiary purposes. *See* Annotation, 86 A.L.R.4th at 709; Practicing Law Institute, *Applying Polygraph Methodology to Monitor Probated Offenders,* 159 PLI/Crim 625, 629 (1991).

In *State v. Riles*, 135 Wash.2d 326, 957 P.2d 655 (1998), a case involving a defendant convicted of rape of a child, for example, the Washington Supreme Court held that, even though polygraph results are not generally admissible in a trial, "[a] trial court has authority to impose monitoring conditions such as polygraph testing[,]" because such testing is valid "as an investigative tool." [6] *Id.* at 663.

In *Cassamassima v. State*, 657 So.2d 906 (Fla.Dist.Ct.App.1995), which involved a defendant convicted of lewd assault on a child, the appeal court concluded that "the lower court may require ... defendant to take a polygraph at reasonable intervals and to respond to questions that concern non-criminal conduct so long as the results of the polygraph are not offered in evidence." *Id.* at 911. The court stated that the polygraph condition was "valid for purposes of deterrence and supervision of the probationer[,]" *id.* at 909, and that "[s]o long as the condition is reasonably related to the offense, to the rehabilitation of the defendant or to the protection of the public, it is a valid condition of probation or community control." *Id.* at 909.

Similarly, in *State v. Graville*, 82 Or.App. 253, 728 P.2d 561, 562 (1986), the Oregon Court of Appeals held that the fact that polygraph evidence is not admissible in any

---

**6.** The Washington Supreme Court determined that its conclusion was consistent with the guidelines for therapists treating sex offenders in Washington Annotated Code 246–930–310(7)(b), which provides:

The use of the polygraph examination may enhance the assessment, treatment and *monitoring* processes by encouraging disclosure of information relevant and necessary to understanding the extent of present risk and *compli-*

*ance with treatment and court requirements. When obtained, the polygraph data achieved through periodic examinations is an important asset in monitoring the sex offender client in the community.*

*State v. Riles*, 135 Wash.2d 326, 957 P.2d 655, 663 (1998) (emphases in original). The court acknowledged that this statute does not give trial courts statutory authority to require polygraphs. *Id.* at n. 50.

civil or criminal trial does not preclude a court from imposing polygraph testing as a condition of probation if such testing "is reasonably necessary to accomplish the purpose of probation." *See also Mann v. State*, 154 Ga.App. 677, 269 S.E.2d 863, 866 (1980) (observing that the main function of conditioning probation on submission to a lie detector test "appears to be the added psychological factor that if the probationer fails to tell the truth, he [or she] will be detected[,] [which] purpose would be in furtherance of a successful probation," and holding that "a condition requiring the probationer to submit to polygraph tests ... may be imposed, in the discretion of the trial judge, with no more than a general finding of the court that it is reasonably necessary to accomplish the purpose of probation"); *Patton v. State*, 580 N.E.2d 693, 698 (Ind.Ct.App.1991) (acknowledging that "a probation condition requiring polygraph examinations upon request is appropriate when the condition bears a reasonable relationship to the rehabilitative aspect of probation, e.g., as a deterrence from violating other terms of probation by instilling the fear of detection or where the examination provides probation officials with an indication of the probationer's progress in rehabilitation[,]" but holding, nevertheless, that "absent stipulation or waiver, the results of a polygraph examination are inadmissible in a criminal prosecution").

### 3.

In this case, the family court concluded that "[t]he use of the polygraph is reasonably related to sex offender treatment, relapse prevention, and rehabilitation of sex offenders." The family court specifically found, after considering expert witness testimony and other evidence, that the polygraph was a valuable and effective tool in treating sex offenders because:

(1) It is generally useful in monitoring a sexual offender's progress in therapy and compliance with treatment requirements;

(2) It aids the therapist in confronting and overcoming the common tendency of sex offenders to deny wrongdoing by promoting truthfulness and a willingness to take responsibility for negative behavior and correct the "thinking errors" that caused that behavior, all of which are essential to effective treatment and the prevention of recidivism;

(3) It has in fact greatly diminished the recidivism rate of offenders who have submitted to it; and

(4) It may on occasion support the truth of a therapy participant's denial of wrongdoing and result in the clinical discharge of that participant.

Moreover, the family court took specific precautions to protect Defendant's right against self-incrimination by providing in the 1996 Amended DANC Plea Order that "any statements made, or written documents signed, by [Defendant] during sex offender treatment and pertaining or relating to the incidents that gave rise to the ... matter may not be used against him in this proceeding or any other proceeding."

In light of the family court's purpose for imposing the polygraph requirement on Defendant and its order that the polygraph test results not be used against Defendant for evidentiary purposes, we have no hesitation in concluding that the polygraph condition imposed by the family court was reasonable and authorized under HRS § 853–1.

### 4.

Defendant also argues that the requirement that he undergo polygraph testing was unreasonably imposed because polygraphs are not contemplated under the HSOT Program, adopted pursuant to HRS § 353E–1 (1993). HRS § 353E–1 provides, in relevant part, as follows:

**Sex offender treatment; statewide program established.** There is established a statewide, integrated program for the treatment of sex offenders in the custody of the State to be implemented on a cooperative basis by the department of public safety, the judiciary, and the Hawaii

[Hawai'i] paroling authority, and any other agency that may be assigned sex offender oversight responsibilities. The agencies shall:

    (1) Develop and continually update, as necessary, a comprehensive statewide master plan for the treatment of sex offenders that provides for a continuum of programs under a uniform treatment philosophy;

    (2) Develop and implement a statewide, integrated system of sex offender treatment services and programs that reflect the goals and objectives of the master plan[.]

The record on appeal contains a copy of a 1989 Master Plan for Adult Sex Offender Treatment, which recommends the adoption of an integrated and comprehensive model of sex offender treatment services for criminally convicted adult male sex offender felons in Hawai'i (the Master Plan). There is no indication in the record as to whether this Master Plan, which had a three-year implementation period, was actually adopted as the HSOT Program mandated by HRS § 353E–1 or whether, if the Master Plan was adopted, any updates or modifications were made to the Master Plan. It appears, however, that the Master Plan is the foundational centerpiece of the HSOT Program currently in operation in Hawai'i.

The Master Plan was the culmination of a two-part planning process and was influenced by the work of a "new breed of sex offender treatment specialists" in Oregon, Minnesota, and Vermont who practiced the "New Sex Offender Discipline (NSOD)" approach to treating adult male sex offenders. Treatment programs based on this approach shared the following characteristics:

1.   Public safety is a foremost concern.

2.   A basic admission criteria is that the offender must admit committing the crime(s).

3.   Treatment interventions are eclectic.

4.   Group therapy is the preferred modality.

5.   Groups are comprised of both rapists and child molesters.

6.   Post release treatment and aftercare are viewed as an extension of the offender's total treatment plan.

Hawaii Sex Offender Treatment Team, *Hawaii Adult Sex Offender Treatment Master Plan* (1989) at vii, 10–11.

In recommending an integrated model of adult sex offender treatment reflective of the NSOD approach, the Hawaii Sex Offender Treatment Team[7] which put together the Master Plan was guided by a set of planning assumptions. Among these assumptions were the following:

1.   Some sex offenders are not treatable.

2.   Sex offenders who are treatable need a complete, individualized assessment of their needs.

    . . . .

4.   A broad range of therapeutic interventions enhances a program's ability to treat sex offenders.

5.   Each sex offender needs to undergo a re-education process.

6.   The treatment and educational progress of each sex offender needs to be monitored routinely.

*Id.* at viii, 65–66.

■ Although the Master Plan does not specifically discuss polygraph testing as a treatment tool for sex offenders, there was substantial evidence adduced below that polygraphs can be useful in assessing a defendant's potential success in a treatment program, as well as serve as a therapeutic monitoring device to gauge a defendant's behavioral change, ensure compliance with treatment and supervision conditions, and assess whether a defendant may be approach-

---

**7.** The Hawaii Sex Offender Treatment Team was comprised of representatives of the Hawaii Paroling Authority, Department of Corrections, De-partment of Health, Department of Human Services, and the Judiciary.

ing a level of imminent danger to the community. Accordingly, we cannot conclude that the use of polygraphs was precluded under the HSOT Program.

B. *Whether the Polygraph Condition, as Applied to Defendant, Was Unreasonable and Arbitrary*

On May 15, 1996, the family court entered an Order Setting Aside [Its] 1994 DANC Plea Order, accepted Defendant's nolo contendere plea, found Defendant guilty as charged, and sentenced him to concurrent five years' probation for each of the three counts with which he was charged. As a special condition of probation, Defendant was ordered to comply "with each and every group rule of the HSOT [Program], including but not limited to undergoing polygraph ... examinations as directed[.]"

On June 6, 1996, while Defendant was on probation, he paid for and underwent a polygraph examination administered by a polygraph examiner with the HSOT Program.

Subsequently, the family court reconsidered and set aside its May 15, 1996 Order Setting Aside the 1994 DANC Plea Order, reinstated Defendant's DANC plea, and issued the 1996 Amended DANC Plea Order. The 1996 Amended DANC Plea Order expressly required that Defendant undergo "periodic polygraph examinations as directed by [Mr.] Giovannoni, unless compliance is excused in writing by the [Adult Probation Division]."

When Defendant again refused to undergo any polygraph examinations as required by Mr. Giovannoni, the family court revoked the 1996 Amended DANC Plea Order and, on July 11, 1997, entered a Judgment convicting and sentencing Defendant of the charges against him.

During the proceedings which led to this appeal from the July 11, 1997 Judgment, Defendant adduced expert testimony that

called into serious question the qualifications of the polygraph examiner who had previously examined him, as well as the testing methods used by said polygraph examiner. Defendant maintains that in light of such evidence, it was unreasonable and arbitrary to require him to undergo polygraph testing as a condition of the granting of his DANC plea.

The record reflects, however, that in the proceedings that led to the instant appeal, Defendant was given, but refused, the option of undergoing polygraph testing by a polygraph examiner of his choice. Additionally, the family court specifically ordered that the results of any polygraph test administered to Defendant could not be used against him in this or any other proceeding. Therefore, Defendant was protected from the use of any unreliable test results and, in view of his refusal to undergo any polygraph testing, has no standing to complain about the possibility that the polygraph test results may be unreliable.

C. *Whether the Family Court Validly Revoked the 1996 Amended DANC Plea Order*

In *State v. Nakamura,* 59 Haw. 378, 380, 581 P.2d 759, 762 (1978), the Hawai'i Supreme Court held that a "court may revoke a defendant's probation only where it is satisfied 'that the defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of probation.'" (Quoting HRS § 706–628(1),[8] internal brackets omitted.) Relying on *Nakamura,* Defendant argues he did not violate a "substantial" term and condition of the 1996 Amended DANC Plea Order when he "appropriately questioned the validity and use of polygraph in the sex offender treatment program." Defendant points out that he complied with all other conditions imposed upon him as part of the grant of his DANC plea and had a right to raise his legitimate concerns about the use

---

**8.** HRS § 706–628 was repealed by 1985 Haw. Sess. L. Act 192, § 3 at 327. By section 1 of the same Act, the language of the former HRS § 706–628 was incorporated into HRS § 706–625.

of polygraph examinations in sex offender treatment and the methods by which the polygraph examinations were to be administered.

■ Defendant's arguments are misplaced. The revocation of a trial court's prior grant of a DANC plea is reviewed under the abuse of discretion standard. *See State v. Mun Chung Tom*, 69 Haw. 602, 752 P.2d 597 (1988) ("The grant or denial of a motion for a DANC ... plea is within the discretion of the trial court and will not be disturbed unless there has been manifest abuse of discretion."). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Davia*, 87 Hawai'i 249, 253, 953 P.2d 1347, 1351 (1998) (internal quotation marks omitted).

■ Based on our review of the record, we cannot conclude that the family court abused its discretion when it set aside its 1996 Amended DANC Plea Order, accepted Defendant's nolo contendere plea, and entered judgment convicting and sentencing Defendant.

We note at the outset that this is not a revocation of probation case, as in *Nakamura*. Therefore, the applicable statute is HRS § 853–3 (1993), which provides:

> **Violation of terms and conditions during deferment; result.** Upon violation of a term or condition set by the court for a ... [DANC] plea, the court may enter an adjudication of guilt and proceed as otherwise provided.

In other words, unlike the probation statute, HRS § 706–625(c), which requires probation to be revoked "if the defendant has *inexcusably* failed to comply with a *substantial* requirement imposed as a condition of the order or has been convicted of a felony" (emphases added), an order granting a DANC plea may be revoked "[u]pon violation of a term or condition set by the court."

HRS chapter 853, which governs deferred acceptance of guilty (DAG) pleas and DANC pleas, was first enacted into law by 1976 Haw. Sess. L. Act 154, § 1 at 279, entitled "A Bill for an Act Relating to [DAG] Pleas." Section 1 of Act 154 articulated the legislature's findings and purpose for the Act as follows:

> The legislature finds and declares that in certain criminal cases, particularly those involving first time, accidental, or situational offenders, it is in the best interest of the State and the defendant that the defendant be given the opportunity to keep his [or her] record free of a criminal conviction, if he [or she] can comply with certain terms and conditions during a period designated by court order. Especially where youth is involved, a record free of a felony conviction, which would foreclose certain educational, professional, and job opportunities may, in a proper case, be more conducive to offender rehabilitation and crime prevention than the deterrent effects of a conviction and sentence.
>
> The purpose of this Act is to establish a means whereby a court in its discretion may defer acceptance of a guilty plea for a certain period on certain conditions with respect to certain defendants. The completion of such period in compliance with such conditions may then result in the discharge of the defendant and expungement of the matter from his [or her] record.

1976 Haw. Sess. L. Act 154, § 1 at 279. In 1983, HRS chapter 853 was amended to extend the benefits of the chapter to DANC pleas. 1983 Haw. Sess. L. Act 290, § 1 at 617. In explaining the purpose for Act 290, the House Judiciary Committee reported, in part:

> Presently under [HRS chapter 853], a first-time, criminal offender may have the benefit of having his [or her] records cleared after a successful completion of probation and other conditions imposed by the sentencing court if he [or she] enters a guilty plea before trial in order for him [or

her] to avail himself [or herself] of a[DAG] plea. The requirement of the guilty plea is to signify to the accused his [or her] recognition of his [or her] responsibility....

The significance of a nolo contendere plea is to afford protection to the accused from civil liability....

Your Committee believes that this bill will ensure that an accused will have the benefit of [HRS] chapter 853 by providing that it specifically apply to both guilty pleas and nolo contenderes....

Hse. Stand. Comm. Rep. No. 545, in 1983 House Journal, at 1084. A defendant whose DANC plea is accepted, therefore, has the opportunity, if he or she complies with all the terms and conditions of the DANC plea order, to not only have a clean criminal record but avoid an admission of civil liability as well. It thus behooves a defendant whose DANC plea is accepted to acknowledge responsibility for his or her actions and strictly comply with the terms and conditions of a DANC plea order. If a defendant is unwilling to do this, he or she is perhaps not a good candidate for a DANC plea.

In this case, the record reflects that prior to setting aside the 1996 Amended DANC Plea Order, the family court was extremely patient with Defendant, giving him many opportunities to comply with the terms and conditions of the 1996 Amended DANC Plea Order. When Defendant expressed confusion about the terms and conditions of his DANC plea, the family court clarified the terms and conditions. When Defendant expressed concern about the use of the polygraph results, the family court immunized him from the evidentiary use of the polygraph results. When Defendant objected to the person who would administer the polygraph exam, he was given the option of being examined by a polygraph examiner of his choice.

Under these circumstances, the record amply demonstrates that the family court did not abuse its discretion when it concluded that Defendant's refusal to take the polygraph examination, resulting in his termination from the HSOT Program, constituted a violation of the terms and conditions of the 1996 Amended DANC Plea Order, warranting that it be set aside.

## CONCLUSION

Accordingly, we affirm the family court's order setting aside its September 30, 1996 "Amended Order Granting [Defendant's] Motion for [DANC] Plea" and its July 11, 1997 Judgment, as amended on July 22 and 24, 1997, convicting and sentencing Defendant for three counts of Sexual Assault.

## DISSENTING OPINION OF ACOBA, J.

The family court of the first circuit (the court) showed remarkable patience with Defendant–Appellant William K. Naone (Defendant) and thorough attention to the facts in this case. I must, however, respectfully express my disagreement with the majority opinion. I believe (1) the requirement that Defendant admit guilt notwithstanding acceptance of his no contest plea, may have been an unreasonable deferral and probation condition, (2) despite the special condition to the contrary, Defendant's statements were used against him in this case, and (3) appropriate standards for the administration and verifiability of polygraph examinations must first be adopted before such examinations are required of defendants and the results relied on by the court. Therefore, I would remand the case for consideration of these propositions by the court.

### I.

### A.

First, the conundrum in which the court and Defendant were enmeshed appeared to stem from conflicts between the purported objectives of the group therapy program assigned to Defendant and the no contest plea entered by Defendant and his understanding of the plea. Hawai'i Rules of Penal Procedure (HRPP) Rule 11(a)(1) permits a defendant to plead "nolo contendere." Such a plea

is allowed "only with the consent of the court[ ]" and "shall be accepted by the court only after due consideration of the views of the parties and the interest of the public in the effective administration of justice." HRPP Rule 11(b). In the event "the court refuses to accept a plea of ... nolo contendere ...., the court shall enter a plea of not guilty." HRPP Rule 11(a)(1).

Defendant pled no contest and requested deferral of his plea.[1] Since the court permitted Defendant to enter a no contest plea, it may be presumed the court considered the views of the parties and the public in doing so. *Cf. State v. Sinagoga,* 81 Hawai'i 421, 428, 918 P.2d 228, 235 (App.1996) (stating that "[t]he law presumes that judges will conscientiously fulfill their duty" to consider facts set forth in HRS § 706–606 when imposing a sentence). It is well recognized that a plea of no contest is *not* an expression of guilt. *State v. Merino,* 81 Hawai'i 198, 218, 915 P.2d 672, 692 (1996) (citing *North Carolina v. Alford,* 400 U.S. 25, 35–36 n. 8, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)); *State v. Cambra,* 9 Haw.App. 160, 163, 828 P.2d 295, 297, cert denied, 73 Haw. 626, 829 P.2d 859 (1992) (stating that "the unanimous rule of law is that a no contest plea is not an admission of guilt"). Hence, although a guilty plea and a no contest plea

> culminate[ ] in a criminal conviction, a defendant, by pleading guilty, admits to having unlawfully engaged in the charged criminal conduct, whereas, by pleading no contest, he or she neither admits to nor denies having done so, but rather chooses not to contest the charge to which the plea is entered.

*Merino,* 81 Hawai'i at 217, 915 P.2d at 691 (citations omitted).

Our supreme court has held that the trial court, in its discretion, may inquire into the factual basis of a no contest plea under HRPP Rule 11(b) but is not required to do so, as would otherwise be the case if the trial court were considering the acceptance of a guilty plea under the mandate of HRPP Rule 11(f). *Id.* at 217–18, 915 P.2d at 691–92. According to the supreme court, this construction of the HRPP was garnered from the rationale governing similarly worded rules in the Federal Rules of Criminal Procedure (FRCP):

> "At one time in the past the Advisory Committee on [federal] Criminal Rules proposed that a plea of nolo contendere not be accepted without the court first satisfying itself that the defendant committed the crime charged. *This overlooked the fact that an innocent defendant may not wish to contest the charge and that the nolo plea is a means for him or her to do this.* Accordingly that proposal was not adopted and Rule 11(f), requiring the court to determine the accuracy of a plea, applies to guilty pleas but not to pleas of nolo contendere."

*Id.* at 218, 915 P.2d at 692 (quoting 1 C. Wright, *Federal Practice and Procedure: Federal Rules of Criminal Procedure* § 177, at 670–71 (2d ed.1982) (footnotes omitted)) (brackets and emphasis omitted; emphasis added). The supreme court also relied on *Alford,* where the United States Supreme Court reiterated that

> "FRCP 11 preserves this distinction in its requirement that a court cannot accept a guilty plea unless it is satisfied that there is a factual basis for the plea; *there is no similar requirement for pleas of nolo contendere, since it was thought desirable to permit defendants to plead nolo without making any inquiry into their actual guilt.*"

*Id.* (quoting *Alford,* 400 U.S. at 35–36 n. 8, 91 S.Ct. 160 (internal quotation marks and citation omitted)) (brackets omitted; emphasis added). Accordingly, a trial court is not required to ascertain the factual basis for a no contest plea, in view of the fact that in entering such a plea the defendant does not admit guilt:

> The main purpose of the nolo contendere plea is to allow the court and the defendant

---

1. It may be noted that according to the record, this case was referred to the Honolulu Police Department by the State of Hawai'i Child Protective Service.

to avoid the time and expense of trial. If the court allows the plea without requiring the defendant to present a factual basis for the plea, the *defendant avoids having to admit guilt,* "saves face," and is shielded from having the plea used against him or her in any civil suit based on the alleged illegal conduct.

*Id.* (citing *State v. Medeiros,* 8 Haw.App. 39, 42–44, 791 P.2d 730, 733–34, cert. denied, 71 Haw. 669, 833 P.2d 901 (1990)) (emphasis added). Here, Defendant signed a pre-printed plea form which indicated he thought it "better to put [himself] at the mercy of the court." There is no record of Defendant himself presenting a factual basis for his plea.

#### B.

As indicated, there may be various grounds for pleading no contest, and such a plea may be entered even if a defendant is innocent under the law. I submit, then, that if a trial court allows a defendant to enter a no contest plea, the premise of which is that the defendant would thereby avoid having to admit guilt, it may be unreasonable to require, as a condition of deferral or probation, that the defendant would have to do so. However that is, in effect, what occurred in this case.

#### II.

#### A.

In setting aside the reinstatement of Defendant's deferred acceptance of nolo contendere (DANC) plea on July 11, 1997 and resentencing Defendant to probation and six months' imprisonment as a condition thereof, the court pointed to Defendant's refusal to admit guilt:

Specifically, *he failed to show victim empathy, he failed to take responsibility for his actions,* and he failed to show less cognitive distortions, *he failed in completing his assignment[s].*

He did not—I believe, as Mr. [Joseph] Giovannoni [ (Giovannoni) ] indicated, that

*he did not intervene sufficiently in this— his denial and he did not demonstrate understanding of circumstances leading to his offense.* And, of course, he did [not] take the polygraph examination and so he was terminated for all of those reasons.

(Emphases added.) Under the course which was adopted in this case, Defendant was logically doomed to failure because the 1989 Master Plan for Adult Sex Offender Treatment (Master Plan) states, "A basic admission criteria is that the offender must admit committing the crime(s)." Majority opinion at 304, 990 P.2d at 1186.

#### B.

I do not suggest that under such circumstances the only alternative left to the court would have been to reject Defendant's DANC plea. Indeed, under the appropriate facts, the rejection of a DANC plea may amount to an abuse of discretion. But as shown, there were other professionals available to treat Defendant. Defendant did propose treatment without group therapy through a psychologist or by Dr. Robert C. Marvit (Marvit), a psychiatrist, who was willing to meet the treatment requirements of the family court. The court ordered treatment by Marvit, but at the same time required group treatment under Giovannoni. The treatment plan proposed by Marvit appears to satisfy the planning assumptions of the Master Plan which called, in part, for "complete, individualized assessment of [a defendant's] needs" and "[a] broad range of therapeutic interventions." Accordingly, other treatment was apparently available which was tailored to the circumstances, one of those circumstances being Defendant's no contest plea. There may have been other treatment programs available which are not reflected in the record.

The court's and probation department's continued emphasis on polygraph examinations seems counter to the Hawaii Sexual Offender Treatment (HSOT) principle that treatment interventions can be "eclectic." Likewise, the insistence on group therapy

seems inconsistent with the HSOT principle that group therapy is the "preferred" and therefore implicitly not the *exclusive* modality of treatment. Certainly, in prescribing conditions, the court was not statutorily bound to any one program or course of treatment.

## III.

Second, I find nothing salutary in the majority's reliance on the special condition which directed that Defendant's statements during treatment "may not be used against him in this proceeding or [in] any other proceedings."[2] Defendant gained nothing by this special condition.

Because Defendant had been permitted to enter a no contest plea, any evidence obtained in this proceeding could not in any event be used in "any other proceeding," whether Defendant's deferral motion was ultimately granted or not. Further, contrary to the majority's contention, Defendant was not "immunized" from the adverse consequences of his statements. The results of the polygraph examination were in fact "used against him in this proceeding." His purported denial of responsibility was the basis for expulsion from Giovannoni's program, the resulting denial of a DANC disposition, and subsequent probationary sentence of imprisonment. *See infra* part IV.B. Under such facts, this special condition was violated and Defendant's responses on the polygraph examination should not have resulted in termination from the group program.[3]

## IV.

Third, the record gives rise to concerns about the polygraph examination requirement.

2. The stipulation and order was not limited to incriminating statements and broadly stated:
    The parties in the above entitled case stipulate that any statements made, or written documents signed by William K. Naone for treatment regarding the incident or related to the incident in the above-entitled matter will not be used in this proceeding or any other proceeding against him.
    DATED: Honolulu, Hawaii, July 7, 1995.

3. The "Relapse Prevention Group Rules" imposed by Joseph Giovannoni do not state that

## A.

On February 27, 1996, Defendant was apparently terminated by Giovannoni for refusing to undergo a polygraph examination. As a special condition of probation, the court ordered in a May 15, 1996 probation order, that Defendant take "polygraph examinations as required." In its September 30, 1996 findings of fact, conclusions of law and order, the court found that the *"primary reason* for [Defendant's] termination from the group program was [D]efendant's refusal to undergo a polygraph examination."

It should be observed that a polygraph examination is "not specifically discuss[ed] ... as a treatment tool" under the Master Plan. Majority opinion at 304, 990 P.2d at 1186. Further, upon reviewing the recommendations of the Association for Treatment of Sexual Abusers which Giovannoni followed, Marvit stated, "[T]here is **no** empirical, objective or scientifically validated evidence[ ] that polygraphs can either effectively monitor or prevent relapse in sexual offenders." (Boldfaced and underscored emphasis in original).

## B.

On June 3, 1996, after being placed on probation, Defendant did in fact undergo a polygraph examination. As a result, Defendant was readmitted to Giovannoni's program. According to the resulting polygraph report, Defendant "was deceptive to all of the questions except that of alcohol use and illegal criminal activity." Thereafter, the parties stipulated that Defendant was terminated from the program again because *"he didn't pass* [the polygraph exam] and he

failure to pass a polygraph examination results in expulsion from the program. Rather, the "rules" indicate that the polygraph exam is used as an *ongoing* treatment tool. The rules state in relevant part, "[A] polygraph ... is to insure honesty in treatment, and encourage further disclosure. As [a client] demonstrate[s] compliance, the *frequency of the polygraphs may decrease accordingly."* (Emphasis added.)

[was] still in denial from [Giovannoni's] point of view." (Emphasis added)

At the September 27, 1996 hearing, Giovannoni presented a "guideline" for polygraph examination which he had prepared on August 19, 1996. Giovannoni admitted that prior to August 19, 1996, and *thus at the time of Defendant's examination, he "did not have any written guidelines for [a] polygraph examination."* (Emphasis added.) The twelve-line "guideline" itself establishes no parameters for the polygraph procedure and is addressed to the *taker,* not the examiner.

Under his polygraph procedure, Giovannoni related that he would call the polygraph examiner prior to the exam in order to "give some information about the person's sexual history" which might be relevant to appropriate questions to be asked. He conceded that the procedure he had described was never reduced to writing. Even after the polygraph examination was challenged, the "guideline" produced did not set forth any procedure for initiating, administering, or evaluating a polygraph examination or its results.

At a July 11, 1997 hearing, Defendant entered into evidence a March 27, 1997 letter from Stan Abrams, Ph.D. (Abrams), which asserted that "[t]here is no research that demonstrates [the administered test's] accuracy and no one in the sex abuser testing programs uses it that I'm aware of." Abrams further stated that he "d[id] not think [Defendant's] test [was] of much value" and concluded that he "would not place any value in these charts or . . . technique."

At the same hearing, Defendant also entered into evidence an April 28, 1997 letter from Edward Clarke (Clarke) of the Hawai'i Organization of Polygraph Examiners (HOPE), which disclosed that the type of questions asked of Defendant were "nonstandardized." According to Clarke, the HOPE Quality Control Committee *"was unable to render an opinion concerning this examinee's truthfulness to any of the questions. If the issue of the examinee's truthfulness is still an issue, the committee rec-* *ommends retesting with a standardized technique."* (Emphasis added.) Clarke noted that the examiner retained by Giovannoni "no longer utilized this technique."

The substance of Clark's and Abrams's comments are not rebutted and Defendant was never retested.

In sum, Defendant was required to undergo a polygraph examination which was not subject to objective standards and subsequently determined to be of questioned reliability. Despite his emphasis on the importance of such exams, Giovannoni did not have any established written guidelines prior to the one proposed on August 19, 1996. The questions to be asked during the polygraph examination were of critical importance; however, Giovannoni related at the September 27, 1996 hearing that he lacked any standard procedure for the administration of such exams.

### C.

I agree that the trial courts may require a defendant to undergo a polygraph examination as a condition of deferral or probation. However, it is difficult to give credence to the polygraph results or to the use of a polygraph in this case. Polygraph practitioners have concluded that the questions used by the examiner did not conform to any known procedure and the results cannot be validated. The examiner himself apparently received little guidance. Such circumstances call into question the polygraph examination, the use of the polygraph data, the monitoring of such a program, and the reliance placed on it by the therapist and in turn, the court. Under these circumstances, this polygraph requirement is not a reasonable condition of deferral or probation. Unless appropriate standards and procedures are *first* adopted to ensure that polygraph results are verifiable and reliable, the data derived from polygraph examinations serve no purpose and should not have been used as a reason to terminate Defendant from the program. *See supra* note 3.

### D.

It is no answer, as the majority suggests, that Defendant was given the option of be-

**312**

ing examined by a polygraph examiner of his choice. I note, first, that the court never entered an order permitting or directing that that be done. Second, the responsibility for structuring a valid polygraph examination was with the HSOT program, not with Defendant. Finally, this option was clearly empty of substance since there were no governing criteria for a defendant's administration of his own polygraph examination. Indeed, at the July 18, 1997 hearing, Defendant's counsel asked, in reference to such a suggestion, "[W]hat type of polygraph examination am I suppose[d] to administer to [Defendant?]" Regardless of the apparent unreliable results from the polygraph examination, the court rejected counsel's offer of "having [Defendant] comply with this polygraph examination" by using another examiner.

## V.

It should be emphasized that Defendant apparently complied with all conditions of the deferral except for conditions relating to the admission of guilt under Giovannoni's program. Indeed, in its September 30, 1996 findings of fact, the court found that even after Defendant was terminated from the group program on February 27, 1996, he "continued to attend [Giovannoni's] weekly therapy sessions ... and, as of July 30, 1998, had paid Giovannoni a total of more than $2000" for treatment. In addition, Defendant continued his individual sessions with Marvit.

Under the July 24, 1997 order of resentencing, the court reimposed, as terms and conditions of probation, the same polygraph and Giovannoni "Group Rules" conditions as were in place under the prior orders. These terms and conditions invite, in the future, the same problems encountered under Defendant's deferral motion.

On acceptance of his no contest plea, the court was authorized to impose such probation conditions as might be imposed on a convicted person. However, it is arguable that, reasonably, such conviction means De-

fendant should be required to admit guilt on the pain of probation revocation, when in the first place, Defendant was permitted to avoid admitting guilt through the acceptance of his no contest plea.

## VI.

For the foregoing reasons, I would remand the case to the court for its reconsideration in light of the matters discussed above. Assuming *arguendo* Defendant's delay in taking a polygraph examination constituted sufficient grounds for denying deferral of the no contest plea, I would remand the case for the court's consideration of the matters discussed herein in connection with the last probation order, because that order incorporated the same disputed conditions imposed under the deferral orders.